UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GREGORY G. BARRETT, Individually and On Behalf of All Others Similarly Situated,<br><br>                                        Plaintiff,<br><br>v.<br><br>PJT PARTNERS INC., ANDREW W.W. CASPERSEN, PAUL J. TAUBMAN, and HELEN T. MEATES,<br><br>                                        Defendants. | 16-cv-2841 (VEC)<br><br><br>CLASS ACTION<br><br><br>DEMAND FOR JURY TRIAL |

## AMENDED CLASS-ACTION COMPLAINT

Lead Plaintiff Gregory G. Barrett, individually and on behalf of all others similarly situated, alleges the following based upon personal knowledge as to his own acts and upon information and belief as to all other matters based on the investigation by Lead Counsel, which included a review of, *inter alia,* SEC filings by PJT Partners Inc. ("PJT" or the "Company"), press releases and other public statements by Defendants, media and analyst reports and advisories about the Company, and other public information. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all persons other than Defendants who purchased or otherwise acquired PJT securities between October 1, 2015 and March 28, 2016, both dates inclusive (the "Class Period"), seeking damages caused by Defendants' violations of the federal securities laws and pursuing remedies under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder.

2.     During the Class Period, Defendants touted their top-tier advisory services, emphasizing repeatedly that their success depended on their track record and "reputation as a trusted, long-term strategic advisor." Defendants also represented that they had sound internal controls. In truth, one of their supposedly trusted and high-profile advisors, Andrew Caspersen, was in fact perpetrating a two year fraudulent scheme whereby he stole tens of millions of dollars from investors and misappropriated millions of dollars in fees that were due to the Company.

3.     Caspersen's fraud was facilitated by the Defendants' utterly deficient compliance and internal controls.  The market was unaware of the true facts until late March 2016, when Caspersen was arrested and charged with criminal securities fraud. PJT's stock price plummeted on the news, causing substantial losses to Class members. On July 6, 2016, Caspersen pled guilty to the charges, admitting that he had conned investors out of $38.5 million.

## JURISDICTION AND VENUE

4.     The claims asserted herein arise under sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b), 78t(a)) and SEC Rule 10b-5 (17 C.F.R. §240.10b-5).

5.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331, 1337, and section 27 of the Exchange Act, 15 U.S.C. § 78aa.

6.     Venue is proper in this District under section 27 of the Exchange Act and 28 U.S.C. §1391(b), as the Company is headquartered in this District.

7.     In connection with the conduct alleged herein, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including but not limited to mail, interstate telephone and wire communications, and a national securities exchange.

## PARTIES

8.      Lead Plaintiff purchased PJT securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the corrective disclosure alleged herein.

9.      Defendant PJT is incorporated in Delaware with principal executive offices at 280 Park Avenue, New York, NY 10017.

10.     Defendant Andrew W.W. Caspersen was a managing principal at PJT's Park Hill Group at all relevant times until his termination on March 28, 2016.

11.     Defendant Paul J. Taubman founded PJT Capital LP in early 2013 and has served as Chairman of the Board and CEO since the Company went public on October 1, 2015. He also serves as the Chair of the Nominating and Governance Committee. Before founding PJT Capital LP, Defendant Taubman was Co-President of Morgan Stanley's Institutional Securities Division.

12.     Defendant Helen T. Meates has been a partner and Chief Financial Officer of PJT since October 1, 2015. Prior to that, she worked at Morgan Stanley for twenty-two years, most recently serving as a managing director. As CFO, she either knew or should have known about Caspersen's fraudulent activities.

13.     Together, Caspersen, Taubman, and Meats are the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

## PJT

14.     PJT is a global investment bank that provides financial advice to a wide range of clients, including corporations, financial sponsors, institutional investors, and governments, on strategic decisions such as mergers, recapitalizations, private fund placements, restructurings and reorganizations, and other corporate finance matters.

15.     PJT was established in October 2015 after the Blackstone Group L.P. spun off its advisory businesses, which were then combined with PJT Capital LP, a M&A financial-advisory firm founded by Defendant Taubman in 2013. Shares in the combined business were distributed to Blackstone's unitholders, and the new company began trading on the New York Stock Exchange ("NYSE") under the symbol "PJT" on October 1, 2015.

16.     In connection with its stock going public, PJT filed a registration statement on Form 10 on March 4, 2015, which it subsequently amended four times. The final version (the "Registration Statement") was filed on September 2, 2015. The Registration Statement contained, as Exhibit 99.1, the Information Statement of PJT Partners Inc., dated September 2, 2015 ("PJT Information Statement").

17.     The PJT Information Statement portrayed PJT to investors as "a dedicated advisory firm whose core mission is providing client-focused advice and solutions." Building on Blackstone's experience and reputation but no longer constrained by its conflicts of interest, PJT could combine "the legacy, scale and scope of a well-established business" and "the entrepreneurial energy of a new firm."

18.     PJT purported to have "world-class franchises in each of the areas in which we compete," organized into three groups:

> (a)     The Strategic Advisory Group, which advises companies, financial sponsors, and governments on M&A, capital markets advisory, spin-offs, private placements, structured products, and other transactions;
>
> (b)     The Restructuring and Special Situations Group, which advises companies, creditors, and financial sponsors on recapitalizations, reorganizations,

exchange offers, debt repurchases, capital raises, and distressed mergers and acquisitions; and

(c)      The Park Hill Group, which provides fund-placement and secondary advisory services for alternative investment managers, such as private-equity funds, real-estate funds, and hedge funds.

19.      Of particular relevance here, the PJT Information Statement described Park Hill as follows:

> Park Hill Group, our funds advisory services business, is the world's leading private equity and real estate fund placement agent, having served as a placement agent to more than 194 funds raising approximately $261 billion for a diverse range of investment strategies since its inception in 2005. Moreover, Park Hill Group is the only group among its peers with top-tier dedicated private equity, hedge fund and real estate advisory groups, as well as a dedicated team that supports secondary transactions in limited partnership interests in existing funds.

20.      As of June 30, 2015, Park Hill had 14 partners, working in seven offices around the world. Strategic Advisory had 9 partners; and Restructuring and Special Situations had 8 partners.

21.      According to PJT's annual report for 2015, filed on Form 10-K on February 29, 2016, (the "2015 10-K"), PJT derives "[s]ubstantially all" of its revenues from advisory fees and placement fees, with $286 million from advisory fees and $114 million from placement fees in 2015. Park Hill generates both advisory fees and placement fees, whereas the two other groups generate only advisory fees.

22.      Park Hill generates placement fees largely by helping its clients find investors interested in "alternative" investments, which involve assets other than stocks, bonds, and cash, including tangible assets like precious metals and art as well as financial assets like real estate,

commodities, private equity, distressed securities, hedge funds, venture capital, and derivatives.

The PJT Information Statement explained as follows:

> Our funds placement services are provided within Park Hill Group and primarily serve private equity, real estate and hedge funds. Our team advises on all aspects of the fundraising process including competitive positioning and market assessment, marketing materials and related documentation, and partnership terms and conditions most prevalent in the current environment. We also provide private placement fundraising services to our corporate clients and earn placement fees based on successful completion of the transaction.
>
> Fund placement fees earned for services to alternative investment funds are typically recognized as earned upon acceptance by a fund of capital or capital commitments, in accordance with terms set forth in individual agreements. For commitment based fees, revenue is recognized as commitments are accepted (referred to as a "closing"). Fees for such closed end fund arrangements are generally paid in quarterly installments over three or four years, and interest is charged to the outstanding balance at an agreed upon rate (typically the London Interbank Offered Rate ("LIBOR") plus a market-based margin). For funds with multiple closings, each closing is treated as a separate performance obligation. As a result, we recognize revenue at each closing as our performance obligations are fulfilled. For hedge fund structures, placement fees are earned based on net asset value ("NAV") and calculated as a percentage of a placed investor's month end NAV. Typically, we earn fees for such hedge fund structures over a 48 month period. For these arrangements, revenue is recognized monthly as the amounts become fixed and determinable.

23.     Park Hill generates advisory fees by providing advice about the secondary market for alternative assets, such as coordinating negotiated sales, broad auctions, and complex structured transactions concerning interests in private-equity funds. Park Hill assists clients on all aspects of secondary transactions including end-to-end process management, buyer identification and segmentation, structuring, valuation, due diligence coordination, counterparty negotiation, and closing.

**Caspersen**

24.     Defendant Caspersen joined the Park Hill Group in January 2013 as a managing principal. Before joining Park Hill, Caspersen had worked for nine years for Coller Capital, a global firm focused on the private-equity secondary market, and one year at Westby Corp., a real-estate company controlled by the Caspersen family.

25.     When Park Hill joined PJT in October 2015, Caspersen also became a managing director of PJT, while remaining a managing principal and partner at Park Hill. He remained in these positions until his termination on March 28, 2016.

26.     Park Hill announced the hiring in the following statement on February 12, 2013:

The Park Hill Group, a division of Blackstone (NYSE:BX), today announced that Andrew Caspersen has joined as a Managing Principal, with a focus on its secondary advisory business. This business delivers liquidity and capital solutions to private equity investors and managers. Mr. Caspersen was most recently a principal at Coller Capital, where he sourced, evaluated and closed secondary transactions in the U.S. market.

Larry Thuet, a Senior Managing Director at Park Hill, said, "We are delighted that Andrew is joining us. As private equity matures as an asset class, there is a growing need for both investors in, and managers of, older vintage private equity funds to increase their options as to how and when they monetize their portfolios to enhance liquidity and access new capital. We expect that providing secondary solutions in this area will continue to be an important part of our services we provide our clients."

Andrew Caspersen added, "I am pleased to join Park Hill. It has an outstanding track record as a trusted adviser both to LPs and GPs. We can build on these relationships as we offer this new suite of services to tailor solutions to particular needs."

***Andrew will lead Park Hill's effort to deliver capital solutions to mature funds by working directly with private equity fund managers and limited partners through structured secondary transactions***. He is a graduate of Princeton University and Harvard Law School.

> The Park Hill Group, an affiliate of Blackstone, is a leading global alternative asset placement agent with over 70 professionals based in 10 offices around the globe. Park Hill Secondary Advisory is fully integrated within the broader Park Hill Group, utilizing a global network of relationships to deliver superior results across multiple asset classes. Further information is available at www.parkhillgroup.com.

27.     The hire was noted within the industry, as Caspersen brought a valuable expertise that added significantly to Park Hill's capabilities in the lucrative and rapidly-growing private-equity secondary market, where success required building consensus among fund managers and frustrated investors, which in turn required maintaining a high level of trust.

28.     An article in *Private Equity International,* a monthly magazine published by PEI Media, a prominent financial media group dedicated to alternative investments, explained why Caspersen's hire was "big news for the firm":

> In February, Park Hill Group hired former Coller Capital executive Andrew Caspersen to focus on helping GPs restructure private equity funds that are at or approaching the end of their lives.
>
> The hire wasn't just ***big news for the firm***; it also underscored a broader trend in the market of firms beefing up their fund restructuring capabilities.
>
> More and more general partners have ageing funds that fall into this category—and this has created ***a large and growing opportunity***. Fund of funds Pantheon estimates there are 250 funds that are at least 10 years old, with at least $100 million of net asset value remaining. All told, it reckons there could be up to $100 billion of overall net asset value in these end-of-life funds.
>
> "There are a lot of funds and a lot of capital tied up in older vintages that are approaching the end of their lives or running through their extensions," Caspersen tells Private Equity International. "They're outliving their intended period and their LPs are looking for distributions as well as [to lower] their administrative burden, [so they're] eager to wind those funds down."
>
> Park Hill, the placement agency and secondaries broker affiliate of The Blackstone Group, is not alone in dedicating resources to the strategy; most firms in this area have individuals or teams that explore potential fund restructurings.

Two deals last year outlined ways in which secondary firms could help restructure older funds. Landmark Partners, Vision Capital and PineBridge Investments helped structure a new fund to house three remaining portfolio companies from Willis Stein & Partners' 2001 vintage third fund. And CPPIB anchored a deal that involved the formation of a new vehicle to house five portfolio companies from Behrman Capital's 2000 vintage third fund.

***These are not easy deals to do. LP cooperation is the key to success***, and in both of those deals, some LPs expressed frustration at various aspects of the arrangements.

Of course, investors' hands are usually tied—if they force the manager to liquidate the fund, they either lose assets at fire sale prices or end up with a bunch of shares in private companies that they don't really want. And their only other option is to negotiate with the manager over continued payment of management fees, or maybe even lowering the bar on preferred returns so that the manager still has a chance of hitting carried interest.

In these situations, a restructuring offers genuine hope of a way out. But ***finding consensus among frustrated investors who are out of patience with the GP in question is never easy***.

The prospective secondary firm partner in a restructuring has to go in with eyes wide open, says Jason Gull, partner with fund of funds Adam Street Partners. "Often, but not always, there can be improprieties between the GP and the LP in the context of this restructuring—where the GP is looking to maintain a fee stream and business that would otherwise go away. In order to do so, they can be at odds with their existing LPs."

***Specialists who can consistently solve problems like this may be able to build a very lucrative line of business in the coming years.***[1]

29.    As of October 19, 2015, Caspersen was one of six "senior practitioners" in Park Hill's secondary advisory team. The full team included Park Hill CEO Daniel Prendergast, CAO and Deputy General Counsel Katie Reilly, Partner Lawrence Thuet, and Managing Directors Pablo Calo, Caspersen, and Adrian Millan.

---

[1] *New lease of life,* Private Equity Int'l, Mar. 1, 2013.

30.     Caspersen earned $4.5 million in 2014 and $3.68 million in 2015.

**Misappropriating Payments from Park Hill Clients**

31.     But beginning no later than August 2014, and continuing until his arrest and termination in March 2016, Caspersen perpetrated an elaborate fraudulent scheme that was, in his own words, "just a way…to get money to feed a gambling addiction that was all-consuming at the time."[2]

32.     One part of Caspersen's scheme involved taking advantage of PJT's inadequate compliance, fraud-prevention, and other internal controls—in particular, the Company's billing process that allowed him to personally invoice clients.

33.     Around July 24, 2015, Caspersen opened a bank account under the name "PHG Operating LLC."

34.     Around September 8, 2015, Caspersen sent an invoice to Kohlberg Kravis Roberts & Co. L.P. ("KKR"), a Park Hill client. The invoice was for actual work performed by Park Hill, but Caspersen's invoice directed the unsuspecting client to send the fee to PHG Operating LLC. KKR sent a wire transfer for $8,137,453 to that account, believing it to be a legitimate Park Hill account. Caspersen then transferred $8 million to his personal brokerage account at JPMorgan Chase and used it to execute personal securities trades.[3]

35.     According to a "person with direct knowledge of the situation," Caspersen "took advantage of the firm's policies that were intended to foster a close relationship between clients

---

[2] Christopher M. Matthews, *Andrew W.W. Caspersen Pleads Guilty to Stealing Millions From Investors*, Wall St. J., July 6, 2016, http://www.wsj.com/articles/andrew-w-w-caspersen-pleads-guilty-to-stealing-millions-from-investors-1467839443.

[3] Information, *USA v. Caspersen*, No. 16-cr-00414, ECF No. 17 (S.D.N.Y. June 14, 2016).

and the executives working on their business matters."[4] If PJT had had appropriate internal controls, Caspersen would not have been able to divert PJT's fees so easily into his personal account.

36.     "When PJT Partners' billing staff wondered what had happened to the fee, Andrew wired them the $8.9 million" from his account at Bank of America, using proceeds from the second part of his fraudulent scheme (described below).[5] But Caspersen did not make this payment until November 6, 2015—*two months* after he'd misappropriated KKR's payment by taking advantage of PJT's inadequate billing process.

37.     PJT, apparently, did not think anything was amiss. PJT did not ask KKR why the payment had been delayed. It did not check to see whether the wire transfer had come from an account that actually belonged to KKR.

38.     Caspersen also engaged in a similar fraud on October 21, 2015 with respect to a $762,267 payment from another Park Hill client, which he diverted to PHG Operating LLC and then transferred to his personal brokerage account. Around November 30, 2015, he transferred $762,267 to a Park Hill account.[6]

39.     Again, PJT did not ask the client why the payment had been delayed or check to see whether the wire transfer had come from an account that actually belonged to the client.

---

[4] Matthew Goldstein & Alexandra Stevenson, *A Wall Street Family's Charmed Life Is Thrown Into Turmoil*, N.Y. Times, Apr. 5, 2016, http://www.nytimes.com/2016/04/06/business/dealbook/andrew-caspersens-charmed-life-thrown-into-turmoil.html.

[5] William D. Cohan, *The Wall Street Golden Boy Who Allegedly Fleeced His Friends and Family*, Vanity Fair, June 2016, http://www.vanityfair.com/news/2016/06/andrew-caspersen-fraud.

[6] Information, *USA v. Caspersen*, No. 16-cr-00414, ECF No. 17 (S.D.N.Y. June 14, 2016).

40.     In other words, in a two-month period, $9 million in fee payments from two Park Hill clients—both of whom Caspersen was responsible for invoicing—were not received as scheduled, and when they did arrive, Defendants did not verify the source of the delayed payments. Defendants' disregard of this major red flag constituted extreme recklessness.

### The Fake Investment Opportunity

41.     Another part of Caspersen's scheme involved "fraudulently solicit[ing] investments by falsely representing that he had authority to conduct deals on behalf of [PJT] with another private equity fund, and that investors' funds would be invested in a secured loan to an investment firm, when in fact no such security existed and no such investments were made."[7]

42.     Beginning in August 2014, Caspersen created shell entities with names deceptively similar to those of legitimate funds belonging to PJT clients. He then reached out to friends, family members and professional contacts and offered them what he falsely described as an investment in an $80 million secured-credit facility that would pay a 15% annual return and could be redeemed at any time with 90 days' notice.

43.     To make the purported investment opportunity seem legitimate, Caspersen "dressed it up in the minutiae that he had learned over the years that are typical of Wall Street deals" and "served up pages upon pages of mundane and boring legal documents that were just close enough to actual deals Park Hill was working on."[8]

---

[7] Press Release, U.S. Attorney's Office, Southern District of New York, *Financial Services Firm Partner Arrested And Charged In Manhattan Federal Court With $95 Million Scheme To Defraud Investors* (Mar. 28, 2016), https://www.justice.gov/usao-sdny/pr/financial-services-firm-partner-arrested-and-charged-manhattan-federal-court-95-million.

[8] William D. Cohan, *The Wall Street Golden Boy Who Allegedly Fleeced His Friends and Family*, Vanity Fair, June 2016, http://www.vanityfair.com/news/2016/06/andrew-caspersen-fraud.

44.    For example, in the summer of 2015, Caspersen worked on a matter at Park Hill that involved creating a special purpose vehicle called "Irving Place Capital Partners III SPV" for a private-equity firm.[9] The transaction closed in July 2015 with $1.5 billion in capital, with investors including Caspersen's former employer, Coller Capital. Around the same time, Caspersen incorporated a shell company named "Irving Place III SPV LLC"—with a name deceptively similar to "Irving Place Capital Partners III SPV" but under Caspersen's personal control—and started drawing up fictitious documents using Park Hill templates and letterhead.

45.    Caspersen then reached out to potential investors, telling them he had been involved in the prior Irving Place transaction and that this was a similar deal. He falsely claimed that he'd been offered a "friends and family" investment allocation in a security offered by a private-equity firm in recognition for his work with Park Hill Group, and that he was personally investing in it and also offering it to his family and a limited number of friends. He offered them promissory notes in an $80 million credit facility, secured by $900 million of assets of Irving Place Capital Partners III SPV. He said that Park Hill had created the credit facility so that Coller Capital could buy secondary ownership interests in Irving Place Capital Partners III SPV, and that he and Park Hill were working to solicit investors for the loan. He claimed he had already secured commitments of $30 million from "his family office" and "two others."

46.    Caspersen also registered a domain name and created a fake email address purporting to be for "John Nelson" at Coller Capital. He sent recent quarterly and annual reports for Irving Place Capital Partners III SPV to investors, in order to create the false impression that

---

[9] Specifically, the vehicle was a "stapled secondary," a type of fund restructuring where investors "essentially buy out the existing portfolio and commit new capital for additional investments." Dan Primack, *Private Equity Vet Accused of Stealing $25 Million in Charity Rip-off Scheme*, Fortune, Mar. 28, 2016, http://fortune.com/2016/03/28/private-equity-charity-rip-off.

their investments would be secured by the assets of Irving Place Capital Partners III SPV. He also drafted promissory notes that made misrepresentations to investors, including that:

> (a)    investors would be paid their principal "in immediately available funds" together with interest on the unpaid principal;
>
> (b)    the interest on the outstanding unpaid balance would accrue at an annual rate of 15 to 20 percent and would be paid quarterly;
>
> (c)    investors could redeem their principal upon 90 days' notice; and
>
> (d)    Irving Place III SPV LLC "shall maintain cash or cash equivalents in an amount equal to or greater than" the total of the outstanding principal and accrued but unpaid interest.[10]

47.    Caspersen convinced one of his closest friends, his mother, and at least two of his brothers to invest. "The family, under the impression that Mr. Caspersen was excelling at work, figured it was a safe investment and collectively put in a total of more than $3 million."[11]

48.    Overall, Caspersen attempted to defraud more than a dozen investors of nearly $150 million in this way. Out of those attempts, he succeeded in obtaining 18 payments totaling $38.5 million from more than 10 investors.

---

[10] Information, *USA v. Caspersen*, No. 16-cr-00414, ECF No. 17 (S.D.N.Y. June 14, 2016); Press Release, U.S. Attorney's Office, Southern District of New York, Andrew Caspersen Pleads Guilty In Manhattan Federal Court To Defrauding Investors Of Over $38 Million And Misappropriating Over $8 Million From His Former Employer (Mar. 28, 2016), https://www.justice.gov/usao-sdny/pr/andrew-caspersen-pleads-guilty-manhattan-federal-court-defrauding-investors-over-38.

[11] Serena Ng, Bradley Hope, Christopher M. Matthews & Rob Copeland, *The Unraveling of A Wall Street Scion*, Wall St. J., Apr. 11, 2016, http://www.wsj.com/articles/the-unraveling-of-a-wall-street-scion-1460076768.

49.     In October 2015, Caspersen unsuccessfully tried to solicit as much as $50 million from private-equity firm KKR, one of Park Hill's clients. When KKR asked for more information, Caspersen emailed documents marked "confidential" bearing the logos of Park Hill, which mentioned that Coller Capital was involved. But after a call to Coller Capital revealed that Coller knew nothing of the new deal, KKR decided not to move forward.

50.     In early November 2015, James McIntyre, a managing director at the hedge fund Moore Capital Management and a college classmate of Caspersen's, agreed to invest $25 million—$24.6 million on behalf of a charity affiliated with Moore Capital Management and $400,000 from his own personal account. Caspersen sent McIntyre an e-mail on November 2 with wire-transfer instructions, and then, the next day, a set of fake legal documents purportedly from Irving Place III SPV and signed by John Nelson. On November 5, McIntyre wired the $25 million to an account controlled by Caspersen at Bank of America.

51.     "McIntyre was not aware that Mr. Caspersen was raising money for an investment vehicle that was under his personal control and not for a client of Mr. Caspersen's former firm."[12]

52.     On November 6, 2015, Caspersen wired $8.9 million of the funds to Park Hill to make up for the KKR funds he'd intercepted two months earlier, as well as $17.61 million to his personal brokerage account at JPMorgan Chase.[13]

---

[12] Matthew Goldstein & Alexandra Stevenson, *Victim in Wall St. Scheme Was a Classmate of Its Accused Architect*, N.Y. Times, Apr. 3, 2016, http://www.nytimes.com/2016/04/04/business/dealbook/victim-in-wall-st-scheme-was-a-classmate-of-its-accused-architect.html.

[13] Information, *USA v. Caspersen*, No. 16-cr-00414, ECF No. 17 (S.D.N.Y. June 14, 2016); Press Release, U.S. Attorney's Office, Southern District of New York, Andrew Caspersen Pleads Guilty In Manhattan Federal Court To Defrauding Investors Of Over $38 Million And Misappropriating Over $8 Million From His Former Employer (Mar. 28, 2016), https://www.justice.gov/usao-sdny/pr/andrew-caspersen-pleads-guilty-manhattan-federal-court-

53.     Caspersen used the funds to make large speculative securities trades, almost exclusively trading "one-week put options betting on a decline in the Standard & Poor's 500-stock index" and using "all the cash available in his account each week."[14] He preferred stock options because they allowed him to make high-stakes bets with limited capital. By the end of 2015, his brokerage account had suffered a net loss of approximately $25 million.

54.     Around mid-February 2016, Caspersen's brokerage account contained approximately $112.8 million in cash—enough to repay all of his investors. But instead of repaying his investors, he continued his speculative options trading, ultimately losing $108.2 million between February 11, 2016 and March 9, 2016.[15]

**The Truth Emerges**

55.     Caspersen's fraud began to unravel in March 2016.

56.     On March 1, 2016, Caspersen wrote to McIntyre to solicit another $20 million investment and sent him a new round of fake legal documents.

57.     McIntyre asked to speak to John Nelson at Coller Capital, who had purportedly signed the documents and was vouching for the security that backed the loan. Caspersen sent an

---

defrauding-investors-over-38.

[14] Matthew Goldstein & Alexandra Stevenson, *Andrew Caspersen, Charged in $40 Million Fraud, Had Gambling Addiction, Lawyer Says*, N.Y. Times, June 14, 2016, http://www.nytimes.com/2016/06/15/business/dealbook/andrew-caspersen-charged-in-40-million-fraud-had-gambling-addiction-lawyer-says.html.

[15] Information, *USA v. Caspersen*, No. 16-cr-00414, ECF No. 17 (S.D.N.Y. June 14, 2016); Press Release, U.S. Attorney's Office, Southern District of New York, Andrew Caspersen Pleads Guilty In Manhattan Federal Court To Defrauding Investors Of Over $38 Million And Misappropriating Over $8 Million From His Former Employer (Mar. 28, 2016), https://www.justice.gov/usao-sdny/pr/andrew-caspersen-pleads-guilty-manhattan-federal-court-defrauding-investors-over-38.

e-mail to McIntyre and to John Nelson at a fake e-mail address similar to Coller Capital, setting up a conference call for March 7. But by the time of the call, McIntyre had learned that no one by the name of John Nelson worked at Coller Capital and that the supposed email address belonged not to Coller Capital's actual domain name but to another domain that had been set up 20 minutes after McIntyre had asked for the conference call.

58.     McIntyre told Caspersen that he and the foundation wanted their $25 million back. On March 11, 2016, Caspersen e-mailed McIntyre saying that the money would be returned by the end of March, "if not sooner."[16] Caspersen then tried to solicit an investment from KKR that he hoped to use to repay McInrtyre and Moore, but unsuccessfully.

59.     Moore Capital later contacted Park Hill executives. On the morning of March 16, Park Hill enlisted a law firm, Paul Weiss Rifkind Wharton & Garrison LLP, to investigate.

60.     The fraud was not hard to find. *By that evening*, Paul Weiss had uncovered Mr. Caspersen's alleged scheme. Lawyers promptly informed the Manhattan U.S. attorney's office.

61.     PJT's investors knew nothing about this for almost another two weeks, only learning about Caspersen's fraud after Caspersen was arrested on Sunday, March 26, 2016 and then, on March 28, 2016, charged with criminal securities fraud and fired from his position at Park Hill Group. In a parallel action, the SEC also charged Caspersen with defrauding two institutions to invest in a shell company that he controlled.

62.     Caspersen's bail package required him to "seek treatment for substance abuse as a daily user of alcohol suffering from mental health problems."[17]

---

[16] William D. Cohan, *The Wall Street Golden Boy Who Allegedly Fleeced His Friends and Family*, Vanity Fair, June 2016, http://www.vanityfair.com/news/2016/06/andrew-caspersen-fraud.

[17] Lia Eustachewich & Kate Sheehy, *Wall Street exec accused of swindling charity in $95M*

63.     PJT, trying to mitigate the reputational damage, released a statement on March 28, 2016:

PJT Partners Inc. (the "Company" or the "Firm") (NYSE:PJT), a leading advisory-focused investment bank, today issued the following statement regarding the Company's termination for cause of Andrew Caspersen, formerly a Partner in the Park Hill Group:

Since the inception of our Firm, an unconditional principle of integrity has been a core value as we build a lasting franchise. Our commitment to clients begins and ends with honesty and transparency, and strict adherence to these values is the absolute cornerstone of our Firm.

We were therefore stunned and outraged to learn of the fraudulent circumvention and violation of the Firm's compliance policies and ethical standards by Andrew Caspersen, who was a member of the Secondaries Group at Park Hill since January 2013. Immediately upon learning of facts that suggested improper behavior, we commenced an internal investigation led by outside counsel, Paul, Weiss, Rifkind, Wharton & Garrison, and very quickly thereafter, brought the matter to the attention of the U.S. Attorney's Office in Manhattan. Since that time we have cooperated fully with law enforcement, and we will continue to do so. We have terminated Mr. Caspersen for cause.

Because this matter is the subject of a continuing investigation by the authorities, and our review is ongoing, we are not in a position to provide any additional information at this time. Our Firm's reputation for ethical behavior is fundamental to our business and our highest priority is maintaining the trust of our clients.

According to complaints filed today from the U.S Attorney's office of the Southern District of New York and the Securities and Exchange Commission, Mr. Caspersen was charged with securities and wire fraud in connection with a scheme to defraud investors of more than $95 million. The complaints detail that Mr. Caspersen actually obtained one $25 million payment in November 2015 from an institutional investor by falsely representing that the investment would be secured and took control of the funds for his personal use, and later

---

*scam*, N.Y. Post, Mar. 28, 2016, http://nypost.com/2016/03/28/wall-street-exec-accused-of-swindling-charity-as-part-of-95-million-scam/.

unsuccessfully solicited an additional $20 million from the first investor and $50 million from a second investor.

Any potential liability of the Company with respect to the $25 million that was fraudulently obtained by Mr. Caspersen has not been determined. Moreover, the Company has insurance coverage that it believes would substantially mitigate any potential liability it might have.

64.     PJT's stock price tumbled. On March 28, 2016, it reached a low of $19.96, finally closing at $23.66—a drop of $2.81, or 10.62%, from its $26.47 closing price on March 24. It continued falling, closing at $23.27 on March 29, 2016.

65.     Observers noted the brazen nature of Caspersen's fraud. One observer commented:

This case is atypical in that the scheme seems to have been a fraud from the start . . . . What we normally see in these types of frauds is a manager who runs a bona fide fund business, sustains some significant losses, and rather than own up to them, starts down the path of covering them up, hoping that the cover-up will only be temporary. Eventually the whole thing becomes a fraud—but it doesn't usually start out that way.[18]

66.     At the time, it was unclear where the money had gone. According to a prosecutor at Caspersen's arraignment, "There was a $9 million wire out of his personal brokerage account on Dec. 4 that is still unaccounted for. We just don't know where the money is."[19]

67.     Market observers also interpreted the news as a failure of PJT's controls.

---

[18] Mark Melin, *Apple Not Falling Far From Tree In Case of Andrew Caspersen Fraud Charges*, ValueWalk, Mar. 30, 2016, http://www.valuewalk.com/2016/03/andrew-caspersen-fraud-charges/ (citation omitted).

[19] Mark Melin, *Apple Not Falling Far From Tree In Case of Andrew Caspersen Fraud Charges*, ValueWalk, Mar. 30, 2016, http://www.valuewalk.com/2016/03/andrew-caspersen-fraud-charges/ (citation omitted).

68.    An article in Fortune noted that "The complaints do not include more information about the $8.1 million that Caspersen allegedly stole from PJT, but **clearly the disclosure raises control concerns for the firm**."[20]

69.    A *New York Times* article noted:

The case highlights the broader issue of how much research and checking institutional investors actually do when making an investment, and how much of it comes down to a personal connection and trust.

"This action amply demonstrates that even sophisticated institutional investors are not immune to financial scams," said Andrew M. Calamari, director of the New York office of the Securities and Exchange Commission, which brought a civil complaint against Mr. Caspersen.

***It may also raise questions about the internal controls in place at Park Hill, given that the authorities say Mr. Caspersen's scheme went on for months before it was detected***.[21]

70.    Mark Melin at *ValueWalk* asked, "With mystery wire transfers leaving the firm, what liability does the brokerage firm have?" and "How is it exactly that a wire transfer, which generally requires the destination to be disclosed, can simply vanish?"[22]

71.    Gillian Tan, a *Bloomberg Gadfly* columnist focusing on private equity, explained why she was not convinced by PJT's March 28 statement:

With its reputation tarnished, PJT reiterated a commitment to integrity, honesty and transparency. So there's no doubt that behind closed doors, it's amplifying

---

[20] Dan Primack, *Private Equity Vet Accused of Stealing $25 Million in Charity Rip-off Scheme*, Fortune, Mar. 28, 2016, http://fortune.com/2016/03/28/private-equity-charity-rip-off/.

[21] Matthew Goldstein & Alexandra Stevenson, *Wall Street Scion Is Accused of Faking Investments*, N.Y. Times (Apr. 5, 2016), http://www.nytimes.com/2016/04/06/business/dealbook/andrew-caspersens-charmed-life-thrown-into-turmoil.html.

[22] Mark Melin, *Apple Not Falling Far From Tree In Case of Andrew Caspersen Fraud Charges*, ValueWalk, Mar. 30, 2016, http://www.valuewalk.com/2016/03/andrew-caspersen-fraud-charges/ (citation omitted).

compliance controls to avoid any future hiccups and doing what it can to reassure concerned clients.[23]

72.      On April 5, 2016, the *New York Times,* citing a "person with direct knowledge of the situation," reported that Caspersen "had taken advantage of [Park Hill Group's] payment process that allowed him to personally send out invoices to clients" in order to perpetrate his fraudulent scheme.[24]

73.      On April 8, 2016, the Company filed a Form 8-K with a statement on Caspersen's fraud. According to that statement, Caspersen's unlawful transactions began as early as *late 2014*, significantly earlier than the July 2015 timeline identified by the U.S. Attorney's office and SEC. Specifically:

> PJT Partners Inc. (the "Company") has substantially completed its review of information available to it for the period of Andrew W. W. Caspersen's employment with Park Hill from early 2013 through the date of his arrest, and has determined the following:
>
> Commencing in late 2014 through March of 2016, Mr. Caspersen conducted a number of unauthorized and unlawful transactions outside the scope of his employment with Park Hill. They consisted of schemes Caspersen presented to his family and personal network to make investments in entities formed by him with names resembling parties in legitimate Park Hill transactions. No clients of Park Hill were actual parties in Caspersen's transactions, which were conducted by Caspersen acting alone. Other than the $25 million payment by the party affiliated with Moore Capital Management referred to in the complaint filed by the office of the United States Attorney of the Southern District of New York, the Company has found a small number of apparent victims, consisting of Caspersen

---

[23] Gillian Tan, *PJT Partners' Very Bad Week*, Bloomberg, Apr 1, 2016, https://www.bloomberg.com/gadfly/articles/2016-04-01/boutique-bank-pjt-partners-tough-week-gets-worse-after-anbang.

[24] Matthew Goldstein & Alexandra Stevenson, *A Wall Street Family's Charmed Life Is Thrown Into Turmoil*, N.Y. Times (Apr. 5, 2016), http://www.nytimes.com/2016/04/06/business/dealbook/andrew-caspersens-charmed-life-thrown-into-turmoil.html.

relatives and friends, who made payments totaling approximately $14 million in Caspersen's schemes.

During the course of the Company's review of the legitimate transactions of Park Hill in which Mr. Caspersen was involved, it has found no evidence of irregularities.

Separately, in two instances instead of submitting legitimate client invoices prepared by Park Hill in the amount of $8.9 million, Caspersen replaced them with false invoices containing modified payment instructions. He was able to misdirect the client payments to an account controlled by him using an elaborate structure of entities, domain names and bank accounts that he created. He subsequently wired the exact amount of the legitimate invoices to Park Hill from accounts also controlled by him that had names identified with the clients. The Company discovered these deceptions shortly after being alerted by Moore Capital Management to the investment scheme. At no time did Mr. Caspersen have access to or control over the bank accounts, financial system or financial records of Park Hill.

74.     On July 6, 2016, Caspersen pled guilty, admitting that he raised $38.5 million from investors in non-existent investment vehicles using false and misleading statements.[25]

75.     Subsequently, in its quarterly report for the second quarter of 2016 (the "Q2 2016 10-Q") filed on Form 10-Q on July 29, 2016, PJT revealed that:

As previously disclosed, the Company terminated Andrew Caspersen on March 28, 2016 after learning of a number of unauthorized and unlawful transactions outside the scope of his employment with Park Hill. Based on the Company's current assessment related to this matter, the Company has recorded an expense of $8.9 million, which represents the amount that is considered to be probable and reasonably estimable. The Company has also assessed that it is probable that it will receive $5.6 million in related insurance reimbursement, which has also been recorded in the financial statements. Such expense and related insurance reimbursement were recorded during the three months ended March 31, 2016.

---

[25] *See* Consent of Andrew W.W. Caspersen, *SEC v. Caspersen et al.*, No. 16-cv-02249, ECF No. 17 (S.D.N.Y. Sep. 9, 2016).

With respect to potential additional claims related to funds fraudulently obtained by Mr. Caspersen, the Company believes that any such claims would be without merit and would vigorously defend any such actions.

## Materially False and Misleading Statements

76.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.

77.     Specifically, Defendants touted their top-tier advisory services which were made possible by their reliance on "trusted advisors," and represented that the Company's internal controls were adequate and sound. But while making these representations, Defendants failed to disclose that (a) one of the Company's key personnel was perpetrating a scheme to misappropriate fee payments from the Company's clients and to defraud investors of tens of millions of dollars and (b) PJT's and Park Hill's compliance, fraud-prevention, and internal controls were so inadequate that they allowed his scheme to continue for years, ultimately misappropriating nearly $9 million of Park Hill's clients' payments and defrauding investors of almost $40 million.

78.     These misstatements were material because, as the Company itself emphasized to investors, "[i]ntegrity, honesty and sound judgment are fundamental to the reputation and success of PJT Partners Inc. and its subsidiaries." This was especially true for Park Hill because the nature of its business is particularly reliant on maintaining a trustworthy reputation and close, long-term client relationships.

79.     Park Hill focused on alternative investments, which generally require investors who are willing to make large, long-term, inflexible commitments to risky assets. For example, private-equity funds typically require investors (the "limited partners") to make large up-front investments that cannot be withdrawn for the life of the fund. The private-equity sponsor (the

"general partner") uses those funds to obtain control of a non-publicly-traded company, and the

limited partners have little influence over how it exercises that control. Moreover, alternative

investments tend to lack transparency, with limited reporting requirements and few clear or well-

understood valuation guidelines, making it difficult to judge investment performance in the

interim.[26]

80.     It is also difficult for investors to liquidate their stakes once they've invested.

Limited partnership interests can be bought and sold in the secondary market, but the transfer

process is complex, labor-intensive, time-consuming, and not always possible.[27]

81.     This means that investment relationships in the market for alternative assets

requires a great deal of trust. Such investors tend to be institutional investors, like pension funds

or endowments, or accredited, high-net-worth individuals with close, long-term, trusting

relationships with fund managers.

82.     PJT knew this and heavily touted, in its communications with its own investors,

Park Hill's "trusted client relationships" as well as PJT's "reputation as a trusted, long-term

strategic advisor."

---

[26] For example, private-equity funds must report basic organizational and operational
information, but they need not report the incomes of partners and senior managers, which
companies their funds own, or financial information about the individual companies in their
portfolios. Moreover, the private-equity industry "has no standard method" for calculating "their
most important performance measure—the average returns to LP investors net of fees and
expenses in earlier funds." Eileen Appelbaum. *Private Equity and the SEC after Dodd-Frank*,
(Ctr. for Econ. and Pol'y Research, Jan. 2015), http://cepr.net/documents/pe-dodd-frank-2015-
01.pdf.

[27] Usually, transfers of limited partnership interests must be approved by the general partner, and
no more than 2 percent of partnership interests may be transferred each year—otherwise, the
fund becomes a "publicly traded partnership," triggering significant adverse tax consequences.

83. The PJT Information Statement described the "creativity, insightfulness and clarity of our advice, and the ***trusted client relationships it inspires***" as "the foundation of our business." It described PJT's professionals as "Trusted Advisors with Proven Track Records" who had earned PJT "a reputation as a trusted, long-term strategic advisor by providing thoughtful, tailored solutions to help our clients achieve their strategic, financial and fundraising goals." It emphasized that its partners and team members had "relationships with hundreds of corporate executives, board members, financial sponsors and governments as well as expertise in multiple product areas, industry verticals and geographies." It noted in particular that the Park Hill Group had "relationships with over 3,000 different institutional investors, who collectively manage over $75 trillion of capital." It emphasized to investors that "[t]hese unique relationships and capabilities have the potential to help us drive incremental value for clients, and growth for our company, as we operate in a more integrated and cohesive manner."

84. Similarly, in an earnings call on February 11, 2016, Defendant Taubman told investors that "An important part of our growth strategy has been leveraging the power of our three businesses through increased collaboration to better serve our clients." He emphasized "Park Hill's global scale, depth of expertise in each asset class, and ***deep long-standing investor relationships***" and stated that Park Hill was "seeing early evidence of the synergies with our other businesses."

85. Likewise, in the 2015 10-K, PJT told investors that its business was "based on a highly-experienced team and a relentless focus on our core principles: ***prioritizing our client's interests***, providing superior client service, ***developing our long-term relationships*** and leading with our human and intellectual capital." PJT portrayed itself as a "scaled, diversified global advisory franchise comprised of complementary businesses, which each share our culture of

excellence, teamwork and entrepreneurship." It touted its "**deep networks** across our three businesses" and its ability to attract talented bankers through its "total focus on advisory services; commitment to building a culture of collaboration, character and growth; **strong client relationships**; deep and exceptional base of talent; and efficient and scalable support infrastructure." It stated that "PJT Partners' intangible assets are derived from customer relationships."

86.     The 2015 10-K was even more specific about Park Hill, which it described as "a world-leading fund placement agent" and "the only group among its peers with top-tier dedicated equity, hedge fund, real estate and secondary advisory groups." It emphasized Park Hill's "**long-standing relationships** across Europe, the Middle East, Africa and Asia" which "give them unique access to global capital and drives incremental value for our clients." It also stated that "Our success is built around **the trust our clients have placed in us**."

87.     During the Class Period, Park Hill also made the following statements to investors on its website:

- Park Hill provides global alternative asset advisory and fundraising services across four specialized verticals. Our platform includes deep expertise in private equity, real estate and hedge funds, as well as secondary advisory services. Leveraging a senior team with an average of over 15 years of global alternative asset and distribution experience, Park Hill knows the investment preferences of the world's biggest institutional investors. **Along with our rigorous engagement model and global relationships, our breadth enables us to customize high-quality solutions for the needs of our clients**.[28]

- Park Hill, since its inception, has served as a global advisory and placement agent to funds that raised in excess of $260 billion for 194 private equity, real estate funds, and hedge funds. **Additionally, we provide top-tier global**

---

[28] Park Hill Group, http://parkhillgroup.com (last visited Sep. 23, 2016).

26

> ***distribution capabilities through our senior relationships across the limited
> partner arena***.[29]

- Our ***senior practitioners are actively involved in every stage*** of the
  fundraising process and ***lead our uncompromising dedication to achieving
  superior client outcomes***.[30]

88.    All of the statements above were false and misleading because, while touting Park

Hill's top-tier services and extensive relationships, Defendants failed to disclose the fact that one

of the Company's key personnel was perpetrating a scheme to misappropriate fee payments from

the Company's clients and to defraud investors of tens of millions of dollars.

89.    The statements above are attributable to the Company as well as to Defendants

Taubman and Meates because of their positions of control and authority as CEO and CFO

respectively of PJT. To the extent that they pertain to Park Hill, they are also attributable to

Caspersen because he was a managing director of Park Hill, a high-ranking executive position

that paid him $4.5 million in 2014 and $3.68 million in 2015, and thus had control over these

statements.

90.    Defendants also misrepresented the adequacy of PJT's and Park Hill's

compliance, fraud-prevention, and internal controls, which in fact were so inadequate that they

allowed Caspersen's scheme to continue for years, ultimately misappropriating nearly $9 million

of Park Hill's clients' payments and defrauding investors of almost $40 million

91.    On November 12, 2015, PJT filed a quarterly report on Form 10-Q announcing

the Company's financial and operating results for the quarter ended September 30, 2015 (the

"Q3 2015 10-Q"). The Q3 2015 10-Q contained signed certifications by Defendants Taubman

---

[29] Park Hill Group, http://parkhillgroup.com/businesses (last visited Sep. 23, 2016).

[30] Park Hill Group, http://parkhillgroup.com/leadership (last visited Sep. 23, 2016).

and Meates stating that the financial information contained in the Q1 2015 10-Q was accurate

and disclosed any material changes to the Company's internal control over financial reporting.

92.     On February 29, 2016, PJT filed its 2015 10-K, which contained signed

certifications by Defendants Taubman and Meates stating:

> 1. I have reviewed this Annual Report on Form 10-K for the year ended
> December 31, 2015 of PJT Partners Inc.;
>
> 2. Based on my knowledge, this report does not contain any untrue statement of a
> material fact or omit to state a material fact necessary to make the statements
> made, in light of the circumstances under which such statements were made, not
> misleading with respect to the period covered by this report;
>
> 3. Based on my knowledge, the financial statements, and other financial
> information included in this report, fairly present in all material respects the
> financial condition, results of operations and cash flows of the Registrant as of,
> and for, the periods presented in this report;
>
> 4. The Registrant's other certifying officer and I are responsible for establishing
> and maintaining disclosure controls and procedures (as defined in Exchange Act
> Rules 13a-15(e) and 15d-15(e)) for the Registrant and have:
>
>> a) Designed such disclosure controls and procedures, or caused such
>> disclosure controls and procedures to be designed under our supervision,
>> to ensure that material information relating to the Registrant, including its
>> consolidated subsidiaries, is made known to us by others within those
>> entities, particularly during the period in which this report is being
>> prepared;
>>
>> b) [paragraph omitted in accordance with the Exchange Act Rule 13a-
>> 14(a)];
>>
>> c) Evaluated the effectiveness of the Registrant's disclosure controls and
>> procedures and presented in this report our conclusions about the
>> effectiveness of the disclosure controls and procedures, as of the end of
>> the period covered by this report based on such evaluation; and
>>
>> d) Disclosed in this report any change in the Registrant's internal control
>> over financial reporting that occurred during the Registrant's most recent
>> fiscal quarter (the Registrant's fourth fiscal quarter in the case of an annual

report) that has materially affected, or is reasonably likely to materially affect, the Registrant's internal control over financial reporting; and

5. The Registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the Registrant's auditors and the audit committee of the Registrant's board of directors (or persons performing the equivalent functions):

> a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the Registrant's ability to record, process, summarize and report financial information; and

> b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the Registrant's internal control over financial reporting.

93.     PJT also made misrepresentations to investors on its website that were designed to assure them that PJT had strict standards of business conducts and ethics, and, moreover, had implemented strong internal controls to ensure these standards were met and to prevent fraud and misconduct.

94.     For example, the "Investor Relations" section of PJT's website contains a "Code of Business Conduct and Ethics" (the "PJT Code of Conduct"), which begins by stating that "[i]ntegrity, honesty and sound judgment are fundamental to the reputation and success of PJT Partners Inc. and its subsidiaries."[31]

95.     The PJT Code of Conduct emphasizes that "[t]he **Company takes this Code very seriously**" and purports to include policies "**designed to ensure that all directors, officers and employees of the Company not only conduct themselves lawfully at all times but also maintain**

---

[31] PJT Partners, Inc., *Code of Business Conduct and Ethics*, http://ir.pjtpartners.com/investor-relations/corporate-governance/governance-documents/default.aspx (last visited Sep 22, 2016).

*the highest ethical standards in every aspect of their dealings* with other employees, the

business community, clients and government authorities."

96.     The PJT Code of Conduct includes the following provision concerning conflicts

of interest with family members:

> Directors, officers and employees may not conduct business on behalf of the
> Company and may not use their influence to get the Company to do business with
> family members or an organization with which a director, officer or employee or a
> family member of a director, officer or employee is associated unless specific
> written approval has been granted in advance by the General Counsel.

97.     The PJT Code of Conduct also states the following about "Corporate

Opportunities":

### CORPORATE OPPORTUNITIES

It is the Company's policy that directors, officers and employees may not take
opportunities for themselves that are discovered through the use of Company
property, information or position or use Company property, information or
position for personal gain. Furthermore, directors, officers and employees may
not compete with the Company, directly or indirectly. Directors, officers and
employees have a duty to the Company to advance its legitimate interests when
the opportunity to do so arises. In particular, employees and their family members
should not, without the prior written consent of the General Counsel or a
representative of the Legal Department:

> • Have a material ownership interest in any business enterprise that does
> business with the Company or of any business enterprise that competes
> with the business of the Company where that competition is a material part
> of the other company's business.

> • Hold a position as an officer, director, employee or consultant of any
> business enterprise that does business or competes with the Company as
> provided above.

> • Receive compensation or anything of value from any person or business
> enterprise that does business or competes with the Company as provided
> above.

• Pursue outside of his or her employment with the Company or direct a third party to take any business opportunity that could be considered an opportunity that came to the employee in the course of his or her employment with the Company.

• Take any other action for the Company that results in the employee receiving compensation or any other benefit or value from a source other than the Company that has not been disclosed to and approved in writing by the Company.

98.     These representations were false and misleading because they implied that the Company had adopted controls capable of providing reasonable assurance that these policies were being followed. But in fact, PJT's compliance, fraud-prevention, and internal controls were so utterly inadequate that Caspersen was able to perpetrate a criminal scheme that misappropriated nearly $9 million of Park Hill's clients' fee payments and defrauded investors of almost $40 million.

99.     Defendants' misrepresentations were highly material to investors, given that the Company's business model and revenues hinged upon the trust and confidence clients placed in PJT when investing their money. The alleged material misstatements and omissions created, in the market, an unrealistically positive assessment of the Company and its business, prospects, and operations. As a result, the Company's securities traded at artificially inflated prices during the Class Period.

100.     Lead Plaintiff and other members of the Class had purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of the Company's securities and market information relating to the Company. When the true facts about the Company were revealed to the market, the inflation in the price of the Company's securities was removed and the price declined dramatically, causing losses to Lead Plaintiff and the other members of the Class.

101.    Thus, as a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Lead Plaintiff and other Class members have suffered significant losses and damages.

### Scienter

102.    Caspersen perpetrated the fraud and so had actual knowledge of the fraudulent scheme as well as the Company's inadequate internal controls that enabled that scheme.

103.    Park Hill Group contributed a substantial portion of PJT's total revenues. In 2015, Park Hill generated $114 million from placement fees as well as some portion of the $286 million that PJT generated in advisory fees—totaling at least 28.5% of PJT's overall revenues that year. Because Park Hill is a core operation of PJT, the Individual Defendants can be deemed to have awareness of the materially deficient internal controls that facilitated the fraud.

104.    Defendants' scienter is also demonstrated by their utter failure to establish basic internal controls against fraud. For example, according to news reports, instead of having centralized billing procedures, PJT permitted its partners to personally invoice clients. According to a "person with direct knowledge of the situation," Caspersen "took advantage of the firm's policies that were intended to foster a close relationship between clients and the executives working on their business matters."[32]

105.    This policy violates the basic principle of segregation of duties, a "long-established method of preventing fraud and maintaining checks and balances within a company"

---

[32] Matthew Goldstein & Alexandra Stevenson, *A Wall Street Family's Charmed Life Is Thrown Into Turmoil*, N.Y. Times, Apr. 5, 2016, http://www.nytimes.com/2016/04/06/business/dealbook/andrew-caspersens-charmed-life-thrown-into-turmoil.html.

and a key component of the internal control system of any business. As a report by Ernst &

Young[33] explains:

> Segregation of Duties (SoD) is top of mind for many professionals, from
> compliance managers to executive-level officers. The increased interest in SoD is
> due, in part, to control-driven regulations worldwide and the executive-level
> accountability for their successful implementation. However, the underlying
> reason for these regulations is more important: ***no individual should have***
> ***excessive system access that enables them to execute transactions across an***
> ***entire business process without checks and balances. Allowing this kind of***
> ***access represents a very real risk to the business***, and managing that risk in a
> pragmatic, effective way is more difficult than it seems. . . .

> ***SoD is a basic internal control that attempts to ensure no single individual has***
> ***the authority to execute two or more conflicting sensitive transactions with the***
> ***potential to impact financial statements***. Without proper guidance and a sound
> approach, SoD implementation, testing, remediation and mitigation may appear to
> be extremely difficult to achieve. However, a risk-based approach can make the
> effort manageable for a company of any size.

> ***Companies don't need to create complex role structures or undertake expensive***
> ***system overhauls in order to meet SoD compliance and the principle of least***
> ***privilege***. By focusing on the transactions that pose the greatest risk to the
> business, a company can quickly understand the issues related to access and
> determine — at a level that satisfies management and audit parties — that
> appropriate steps are being taken to remedy and mitigate the root causes of the
> issues. . . .

> In summary, ***not implementing SoD as part of a robust framework puts the***
> ***organization at risk of failing to meet regulatory and compliance requirements***.
> But this is not the only risk.

> The cost of fraud and other internal control failures is well documented in dollar
> values, which is where the cost starts to feel more real.

106.     The website of the American Institute of CPAs likewise explains:

---

[33] Ernst & Young, *A Risk-Based Approach to Segregation of Duties* (May 2010), http://
www.ey.com/Publication/vwLUAssets/EY_Segregation_of_duties/$FILE/
EY_Segregation_of_duties.pdf.

Segregation of Duties (SOD) is a basic building block of sustainable risk management and internal controls for a business. The principle of SOD is based on shared responsibilities of a key process that disperses the critical functions of that process to more than one person or department. ***Without this separation in key processes, fraud and error risks are far less manageable***.

Imagine what would happen if the keys, lock and code for a nuclear weapons system were all in the hands of one person! Emotions, coercion, blackmail, fraud, human error and disinformation could cause grave and expensive one-sided actions that can't be corrected. Or, consider the software engineer who has the authority to move code into production without oversight, quality assurance or access rights' authentication.

Without SOD, either of these scenarios clearly shows the possibility of disastrous outcomes. ***As a result, the risk management goal of SOD controls is to prevent unilateral actions from occurring in key processes where irreversible affects are beyond an organization's tolerance for error or fraud***.[34]

107.    Consistent with this principle, Caspersen should not have been directly invoicing clients, and the billing department should have had a direct line of communication with clients. If PJT had implemented this basic principle, Caspersen would not have been able to manipulate invoices so that they directed the Company's clients to make payments into his personal account.

108.    Defendants' failure to establish this basic control constituted an extreme departure from the standards of ordinary care. By allowing individual partners to take unilateral actions in client billing, and by failing to involve its accounting or billing staff in such an important component of anti-fraud protection, PJT effectively invited the type of fraud perpetrated by Caspersen.

---

[34] Anthony Ghosn, *Segregation of Duties* (American Institute of CPAs), https://www.aicpa.org/InterestAreas/InformationTechnology/Resources/Auditing/InternalControl/Pages/value-strategy-through-segregation-of-duties.aspx (last visited Sep. 22, 2016).

109.     PJT also failed to monitor or otherwise impose controls regarding Caspersen's business communications and transactions. Indeed, Caspersen used his Company email account to defraud his investor victims.

110.     PJT likewise failed to conduct the most basic review of Caspersen's personal trading, which would have uncovered his extensive speculative options trading history and a string of losses—which would have been a glaring red flag of Caspersen's propensity to commit fraud.

111.     Such monitoring is a crucial internal control for preventing fraud and for compliance with laws and regulations concerning insider trading, misuse of confidential information, money laundering, and many other areas. As a white paper published by the Securities Industry Association explained:

> Compliance Department personnel perform *a critical ongoing monitoring and surveillance function*. This role often involves a detailed review of business activities, as well as *surveillance of business transactions and communications, to identify potential issues relating to*, among other things, *the handling of customer accounts, proprietary trading, employee/employee-related trading and employee communications*. Monitoring business activity facilitates ongoing compliance with firm policies and regulatory requirements by helping to identify at their early stages patterns of improper behavior or activities, material or systemic weaknesses and potential product-related problems. Compliance Departments also will test the effectiveness of supervisory procedures, often working with other control functions such as Internal Audit. Compliance Department personnel often develop a risk-based approach to monitoring and surveillance as an effective means to identify problems.

> *Compliance personnel, along with business line management, should escalate "red flags" that arise during monitoring and surveillance*. It is critical that Compliance personnel escalate issues to senior Compliance officers or the [chief compliance officer] for providing to business supervisors as appropriate and provide them adequate support to facilitate a prompt resolution of any deficiencies. If Compliance Department personnel perceive a supervisor's response to be insufficient, Compliance Department personnel should follow a

defined process for escalating and elevating issues to senior Compliance personnel, business line and senior management and/or the Board of Directors.[35]

112.    The Madoff Ponzi scheme had further underscored to Defendants the importance of having internal controls to effectively prevent certain inappropriate activities, such as misrepresentation of performance results and misappropriation of client assets.[36]

113.    Caspersen could not have perpetrated his scheme without using PJT's reputation to lend credibility to a purported investment scheme whose fraudulent nature was not particularly well-disguised. As one of Caspersen's acquaintances told *The Wall Street Journal*:

> Imagine if your brother or your best friend approached asking for a relatively small investment into something he did every day. . . . This is a guy who had ***established himself as a respected and sophisticated investor for more than ten years at some of the most respected firms***. Why wouldn't you put your money in?[37]

114.    Instead of taking reasonable steps to prevent fraud and to safeguard the firm's reputation, PJT lent Caspersen the Company's name without retain rudimentary controls over how he might use it to defraud people out of millions.

115.    Defendants also failed to perform or cause to be performed appropriate due diligence that would have revealed material irregularities in Caspersen's actions and investments. Caspersen's scheme was simple and easy to uncover, absent severe recklessness by Defendants.

---

[35] Securities Industry Association Compliance and Legal Division, *White Paper on the Role of Compliance* (Oct. 2015), http://www.sifma.org/uploadedfiles/societies/sifma_compliance_and_legal_society/role_of_compliance_white_paper%20(2).pdf.

[36] *See*, e.g., Securities and Exchange Commission, Office of Investigations, *Investigation of Failure of the SEC to Uncover Bernard Madoff's Ponzi Scheme—Public Version* (Report No. OIG-509), at 95 (Sept. 4, 2009), www.sec.gov/news/studies/2009/oig-509.pdf.

[37] Serena Ng, Bradley Hope, Christopher M. Matthews & Rob Copeland, *The Unraveling of A Wall Street Scion*, Wall St. J., Apr. 11, 2016, http://www.wsj.com/articles/the-unraveling-of-a-wall-street-scion-1460076768 (citation omitted).

In fact, PJT's outside law firm, Paul Weiss, was able to identify the fraud *within a day* of having been brought in by the Company to investigate. Yet PJT permitted the scheme to go on for years.

116.     Defendants also disregarded red flags that would have alerted them to the fraud. For example, on two separate occasions, Caspersen diverted a total of almost $9 million of client fees to an account created and controlled by him and then used the money for speculative options trades. Each time, the funds did not appear in the Company's account until one or two months later, when Caspersen transferred funds from his own accounts from the proceeds from his fraudulent schemes. The Company's billing personnel were aware that timely client payments had not been made. If they had performed the most basic of investigations into the payments when they were finally received months later, it would have been readily apparent that the funds were originating from Caspersen-controlled accounts, not from PJT clients.

117.     The Company is liable for the acts of the Individual Defendants under the doctrine of respondeat superior and common law principles of agency, as all of the wrongful acts complained of herein were carried out within the scope of their employment. Caspersen's knowledge of the fraudulent scheme, and of the Company's inadequate internal controls that enabled that scheme, is therefore imputed to the Company.

## CLASS ACTION ALLEGATIONS

118.     Lead Plaintiff brings this action as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all those who purchased or otherwise acquired PJT securities during the Class Period (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company at all relevant times; members of their immediate families; their legal representatives, heirs, successors, and assigns; and any entity in which Defendants have or had a controlling interest.

119.     The members of the Class are so numerous that joinder is impracticable. Throughout the Class Period, PJT securities were actively traded on the NYSE. While the exact number of Class members can be ascertained only through discovery, Lead Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by PJT or its transfer agent.

120.     Lead Plaintiff's claims are typical of the claims of the members of the Class. All members of the Class are similarly affected by Defendants' wrongful conduct as alleged herein.

121.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Lead Plaintiff has no interests antagonistic to or in conflict with those of the Class.

122.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the Exchange Act;

(b)     whether statements made by Defendants to the investing public misrepresented material facts about the business, operations, and management of PJT;

(c)     whether the Individual Defendants caused PJT to issue false and misleading statements during the Class Period;

(d)     whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

(e)     whether the price of PJT securities during the Class Period were artificially inflated because of the Defendants' conduct; and

(f)     whether the members of the Class have sustained damages and if so, the proper measure of damages.

123.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

124.     Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     the omissions and misrepresentations were material;

(c)     PJT securities traded in an efficient market;

(d)     the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(f)     Lead Plaintiff and members of the Class purchased, acquired and/or sold PJT securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

125.     Based upon the foregoing, Lead Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

126.     Lead Plaintiff and the members of the Class are also entitled to the presumption of reliance established in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information.

### COUNT I

### Against All Defendants
### Violations of Section 10(b) and SEC Rule 10b-5

127.     Lead Plaintiff repeats every allegation above as if fully set forth herein.

128.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

129.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Lead Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of PJT securities; and (iii) cause Lead Plaintiff and other members of the Class to purchase or

otherwise acquire PJT securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, each Defendant took the actions set forth herein.

130.   Pursuant to the above course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for PJT securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about PJT's finances and business prospects.

131.   By virtue of their positions, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Lead Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

132.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As a managing director of Park Hill Group, Caspersen had knowledge of the details of PJT's internal affairs.

133.   Defendant Caspersen is liable both directly and indirectly for the wrongs complained of herein. As an officer of a publicly-held company, Defendant Caspersen had a duty to disseminate timely, accurate, and truthful information with respect to PJT's businesses,

operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and misleading statements, the market price of PJT securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning PJT's business and financial condition which were concealed by Defendants, Lead Plaintiff and the other members of the Class purchased or otherwise acquired PJT securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

134.    During the Class Period, PJT securities were traded on an active and efficient market. Lead Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired PJT securities at prices artificially inflated by Defendants' wrongful conduct. Had Lead Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Lead Plaintiff and the Class, the true value of PJT securities was substantially lower than the prices paid by Lead Plaintiff and the other members of the Class. The market price of PJT securities declined sharply upon public disclosure of the facts alleged herein to the injury of Lead Plaintiff and Class members.

135.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

136.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### Against Defendants Taubman and Meates
### Violations of Section 20(a) of the Exchange Act

137.    Lead Plaintiff repeats and incorporates every allegation above as if fully set forth herein.

138.    During the Class Period, Defendants Taubman and Meates participated in the operation and management of PJT and Park Hill, and conducted and participated, directly and indirectly, in the conduct of PJT's and Park Hill's business affairs. Because of their senior positions, they knew adverse non-public information about PJT's and Park Hill's financial condition and the inadequacy of their internal controls.

139.    As officers of a publicly owned company, Defendants Taubman and Meates had a duty to disseminate accurate and truthful information with respect to PJT's and Park Hill's financial condition and internal controls, and to correct promptly any public statements issued by PJT which had become materially false or misleading.

140.    Because of their positions of control and authority as CEO and CFO respectively of PJT, Defendants Taubman and Meates were able to, and did, control PJT's and Park Hill's operations and internal controls as well as the contents of the statements which PJT disseminated in the marketplace during the Class Period. Throughout the Class Period, Defendants Taubman

and Meates exercised their power and authority to cause PJT and Park Hill to engage in the wrongful acts complained of herein. Defendants Taubman and Meates were therefore "controlling persons" of PJT and Park Hill within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of PJT securities.

141.     Defendants Taubman and Meates therefore acted as controlling persons of PJT and Park Hill. By reason of their senior management position at PJT, Defendants Taubman and Meates had the power to direct the actions of PJT and Park Hill and thus caused them to engage in the unlawful acts and conduct complained of herein. Defendants Taubman and Meates exercised control over the general operations of PJT and Park Hill and possessed the power to control the specific activities which comprise the primary violations about which Lead Plaintiff and the other members of the Class complain.

142.     By reason of the above conduct, Defendants Taubman and Meates are liable under section 20(a) of the Exchange Act for the violations committed by PJT.

## PRAYER FOR RELIEF

**WHEREFORE**, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action may be maintained as a class action under Federal Rule of Civil Procedure 23 and certifying Lead Plaintiff and Lead Counsel as Class representatives;

B.      Awarding compensatory damages against Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial;

C.      Awarding Lead Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff demands a trial by jury.

Dated: September 23, 2016                 Respectfully submitted,

**POMERANTZ LLP**

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
Murielle J. Steven Walsh
600 Third Ave., 20th Floor
New York, NY 10016
Tel: (212) 661-1100
Fax: (212) 661-8665
Email: jalieberman@pomlaw.com
            mjsteven@pomlaw.com

**BRONSTEIN, GEWIRTZ & GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Tel: (212) 697-6484
Fax: (212) 697-7296
Email: peretz@bgandg.com

***Lead Counsel for Plaintiffs***