USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9/8/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------X
                                                            :
GREGORY G. BARRETT, Individually and on                     :
Behalf of All Others Similarly Situated,                    :
                                                            :
                                  Plaintiff,                :          16-CV-2841 (VEC)
                         v.                                 :
                                                            :          OPINION AND ORDER
                                                            :
PJT PARTNERS INC., ANDREW W.W.                              :
CASPERSEN, PAUL J. TAUBMAN, and                             :
HELEN T. MEATES,                                            :
                                                            :
                                  Defendants.               :
------------------------------------------------------------X

VALERIE CAPRONI, United States District Judge:

The Securities Exchange Act of 1934 prohibits making knowing and recklessly false

statements to the market. But the Exchange Act does not expect management to be guarantors of

the honesty of every employee and not every undisclosed fact is actionable. This case illustrates

the difference. Andrew W.W. Caspersen ("Caspersen"), a partner in the Park Hill unit of

defendant PJT Partners, Inc. ("PJT"), was arrested on March 26, 2016, and charged with

defrauding investors of approximately $38.5 million. Upon disclosure of Caspersen's

wrongdoing, PJT's shares dropped $2.81 per share, or approximately 10.6%. Plaintiff Gregory

G. Barrett ("Barrett") purchased shares in PJT before Caspersen's fraud was uncovered; after

Caspersen's fraud was disclosed he sued PJT (and Caspersen) on behalf of a class of similarly-

situated investors. Barrett brings two claims. He asserts a claim for violations of Section 10(b)

of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5,

against PJT, PJT's chief executive officer Paul J. Taubman ("Taubman"), PJT's chief financial

officer Helen T. Meates ("Meates"), and Caspersen himself for PJT's failing to disclose

Caspersen's fraud and for making allegedly misleading statements regarding PJT's internal

controls and strong client relationships. Barrett also asserts a claim against Taubman and Meates for the same disclosure violations in their capacity as "control persons" pursuant to Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

The Defendants – except for Caspersen, who has not appeared in these proceedings – moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure. They contend that Barrett has not plausibly alleged a material false or misleading statement, and, that even if he had, he has not alleged that PJT, Taubman, or Meates acted with the requisite scienter. For the reasons given below, the Court agrees with Defendants in all respects. The Defendants' motion to dismiss is GRANTED.

## BACKGROUND

PJT is an investment bank based in New York. Am. Compl. (Dkt. 25) ¶¶ 9, 14. The Park Hill unit of PJT provides placement and secondary advisory services to hedge funds, private-equity funds, and real-estate investment funds. Am. Compl. ¶ 18(c). According to the Complaint, in 2015, Park Hill accounted for at least 28.5% of PJT's overall revenue. Am. Compl. ¶ 103. Caspersen was hired by Park Hill in January 2013. Am. Compl. ¶ 24. Caspersen was one of 14 partners at Park Hill (and one of 31 at PJT) as of June 30, 2015, and a "managing principal."[1] Am. Compl. ¶¶ 20, 25. At the time he was hired, Park Hill touted Caspersen's expertise in a press release. Am. Compl. ¶¶ 26-28.

Between 2014 and 2016, Caspersen defrauded his family, clients, and PJT of approximately $38.5 million. Caspersen's scheme had two aspects. Beginning in approximately

---

[1]    The Complaint is inconsistent in describing Caspersen's title at Park Hill. In addition to describing him as a "partner" and "managing principal," the Complaint describes him as a "'senior practitioner[]' in Park Hill's secondary advisory team" and a "managing director." Am. Compl. ¶ 29. As described in Paragraphs 25 and 29, it appears that Park Hill's organizational chart consisted of a CEO, Daniel Prendergast, several other C-suite level employees, one or more partners, and then managing directors. *See* Am. Compl. ¶¶ 25, 29. The Complaint does not describe the reporting lines at Park Hill or between Park Hill and the leadership at PJT.

August 2014, Caspersen marketed to friends, family members, and professional contacts phony investment opportunities that appeared to be Park Hill deals. Am. Compl. ¶¶ 41-45. Caspersen repurposed documents from Park Hill to give these investments a veneer of legitimacy, created fake email accounts to give the appearance that well-respected investors were interested in the opportunities, and created fake websites. Am. Compl. ¶ 46. Separately, Caspersen also defrauded Park Hill and PJT. In September 2015, Caspersen sent an $8.13 million invoice to a Park Hill client requesting that payment be wired to an account he controlled personally, but which appeared to be a PJT account. Am. Compl. ¶ 34. About a month later, Caspersen used the same trick to divert a $762,267 fee from another Park Hill client. Am. Compl. ¶ 38. Caspersen transferred those funds to PJT one to two months later, in November 2015, after PJT billing staff inquired about the missing payments. Am. Compl. ¶¶ 36-38. According to the Complaint, "PJT did not ask the client[s] why the payment had been delayed or check to see whether the wire transfer had come from an account that actually belonged to the client[s]."[2] Am. Compl. ¶ 39. Caspersen used the stolen funds to make highly speculative trades in stock options through a private brokerage account. Am. Compl. ¶ 53.

A Park Hill client reported Caspersen's suspicious behavior to Park Hill in March 2016. Am. Compl. ¶ 59. An investigation by PJT's attorneys quickly uncovered Caspersen's fraud, which they promptly reported to the United States Attorney's Office for the Southern District of New York. Am. Compl. ¶ 60. Caspersen was arrested, charged with securities fraud, and fired. Am. Compl. ¶ 61. PJT disclosed Caspersen's firing in a press release on March 28, 2016. Am.

---

[2] A Form 8-K statement from PJT reproduced in the Complaint explains that Caspersen returned the money from bank accounts that he opened using names that were very similar to the names of the Park Hill clients, thereby giving the appearance that the invoices were simply paid late. Am. Compl. ¶ 73.

Compl. ¶ 63. That day, PJT shares closed down $2.81, or 10.62%. Am. Compl. ¶ 64. PJT subsequently booked an $8.9 million charge in connection with the fraud. Am. Compl. ¶ 75.

Barrett filed an amended complaint on September 23, 2016. The Amended Complaint alleges that PJT failed to disclose that "one of [PJT's] key personnel was perpetrating a scheme to misappropriate fee payments . . . and to defraud investors" and that "PJT's and Park Hill's compliance, fraud-prevention, and internal controls were so inadequate that they allowed [Caspersen's] scheme to continue for years . . . ." Am. Compl. ¶ 77. The Complaint identifies three categories of allegedly misleading statements: statements regarding PJT's long-term relationships to clients and its role as a trusted advisor, Am. Compl. ¶¶ 83-89; statements in PJT's quarterly and annual reports that PJT had in place effective internal controls (the "SOX Certifications"), Am. Compl. ¶¶ 90-92; and statements in PJT's "Code of Business Conduct and Ethics" (the "Code of Conduct"), which emphasize integrity and PJT's internal compliance policies, Am. Compl. ¶¶ 94-98.

Specifically, Barrett alleges the following statements were false: A PJT "Information Statement" that said it had "trusted client relationships," Am. Compl. ¶ 83; a February 11, 2016, statement by Taubman touting Park Hill's "deep long-standing investor relationships," Am. Compl. ¶ 84; statements in PJT's 2015 Form 10-K, which emphasized PJT's "strong client relationships" and Park Hill's "long-standing relationships" and identified among PJT's core values "prioritizing our client[s'] interests, . . . [and] developing our long-term relationships," Am. Compl. ¶¶ 85-86; and statements on Park Hill's website that "along with our rigorous engagement model and global relationships, our breadth enables us to customize high-quality solutions for the needs of our clients" and that Park Hill provided "top-tier global distribution capabilities through [Park Hill's] senior relationships across the limited partner arena," Am. Compl. ¶ 87.

The Complaint alleges that the SOX Certification and Code of Conduct were materially misleading because they could lead a reasonable investor to believe PJT had adopted controls "capable of providing reasonable assurance" that PJT's ethics and compliance policies were being followed, when, in fact, internal controls at PJT were "so utterly inadequate that Caspersen was able to perpetrate a criminal scheme that misappropriated nearly $9 million of Park Hill's clients' fee payments and defrauded investors of almost $40 million." Am. Compl. ¶ 98.

The SOX certification contains the following allegedly misleading statements by Taubman and Meates:[3] that they had "evaluated the effectiveness of [PJT's] disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures," and that "based on [their] most recent evaluation of internal control over financial reporting," PJT had disclosed to its auditors, "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "any fraud, whether or not material, that involves management or other employees who have a significant role in [PJT's] internal control over financial reporting." Am. Compl. ¶ 92. The Code of Conduct states that the Code is "designed to ensure that all directors, officers, and employees of [PJT] not only conduct themselves lawfully at all times but also maintain the highest ethical standards in every aspect of their dealings" and that PJT takes the Code "very seriously." Am. Compl. ¶ 95.

The Complaint alleges that PJT and its senior officers were aware of the fact that PJT had inadequate internal controls and disregarded "red flags" that would have uncovered Caspersen's fraud sooner. The Complaint alleges that it was inconsistent with corporate best practices to

<hr>

[3] The Complaint quotes wholesale from the SOX Certification, without identifying specifically which statements are allegedly false or misleading. These allegations do not comply with the particularity requirement applicable to allegations of securities fraud. Nonetheless, giving Barrett every benefit of the doubt, the Court has done its best to identify the specific statements that he alleges are false and misleading.

permit Caspersen to invoice his clients directly without oversight from the PJT billing department. Am. Compl. ¶¶ 104, 107. According to the Complaint, permitting him to do so violated the corporate compliance principle of "segregation of duties," which entails a system of checks and balances to prevent one individual from gaining "excessive system access." Am. Compl. ¶ 105. Additionally, PJT is alleged not to have adequately monitored Caspersen's corporate email account and personal brokerage accounts. Am. Compl. ¶ 109. Had it done so, according to Barrett, it would have been aware of Caspersen's communications with victims of his scheme and his large, speculative positions in stock options. Am. Compl. ¶¶ 109-10. PJT also allegedly disregarded the fact that on two occasions Caspersen's clients paid their invoices one or two months late and that the funds were paid from accounts controlled by Caspersen. Am. Compl. ¶ 116. Finally, the fact that PJT's outside counsel was able to discover the fraud within a day of beginning its investigation suggests that the fraud was easily uncovered and would have been found sooner by an effective compliance program. Am. Compl. ¶ 115.

PJT, Meates, and Taubman moved to dismiss the Complaint on November 4, 2016. (Dkt. 33).

## DISCUSSION

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must allege sufficient facts, taken as true, to state a plausible claim for relief." *Johnson v. Priceline.com, Inc.*, 711 F.3d 271, 275 (2d Cir. 2013) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007)). "Although for the purposes of a motion to dismiss we must take all of the factual allegations in the complaint as true, we 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted) (quoting *Twombly*, 550 U.S. at 555). "[T]o survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations

sufficient to raise an entitlement to relief above the speculative level." *Keiler v. Harlequin Enters.*, Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citation omitted).

Section 10(b) and Rule 10b–5 make it "unlawful for any person . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . ." 17 C.F.R. § 240.10b–5(b).  To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that "in connection with the purchase or sale of securities, the defendant made material misstatements or omissions of material fact, with scienter, and that the plaintiff's reliance on the defendant's actions caused injury to the plaintiff." *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 765 (2d Cir. 2010) (citing *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)).  There are six elements of such a claim: "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Pac. Inv. Mgmt. Co. v. Mayer Brown LLP*, 603 F.3d 144, 151 (2d Cir. 2010) (quoting *Stoneridge Inv. Partners v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008)).

Defendants move to dismiss on the grounds that the Complaint fails to allege the first two of these elements, a material misrepresentation or omission and scienter, with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b).  Because claims under Section 10(b) and Rule 10b-5 sound in fraud, a heightened pleading requirement applies.  The complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citing

*Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)). The PSLRA further requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2)(A); *Novak*, 216 F.3d at 306-07. Under this heightened pleading standard, a "complaint will survive, . . . , only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).

1.      **False Statements**

The Court begins with whether the Complaint plausibly alleges, with particularity, any false or materially misleading statement by PJT or the individual defendants. To satisfy the PSLRA and Rule 9(b), Barrett must explain why the statements are false and allege "specific facts" that support his claim that the complained of statements were "false when made." *See Rombach v. Chang,* 355 F.3d 164, 172 (2d Cir. 2004) (quoting *Rombach v. Chang*, No. 00-CV-958 (SJ), 2002 WL 1396986, at *4 (E.D.N.Y. June 7, 2002)). The false statements must also be material; "[s]tatements of puffery or mere generalizations are not material misstatements." *City of Brockton Retirement Sys. v. Avon Prods., Inc.*, No. 11-CV-4654 (PGG), 2014 WL 4832321, at *15 (S.D.N.Y. Sept. 29, 2014) (quoting *Woodward v. Raymond James Fin., Inc.*, 732 F. Supp. 2d 425, 433 (S.D.N.Y. 2010)). The Complaint fails on both scores – Barrett has not alleged a false statement by the Defendants, and many of the statements he has identified are immaterial puffery.[4]

---

[4]      The Court rejects Barrett's argument that any of the alleged misstatements identified in the Complaint can be attributed to Caspersen personally under the "group pleading" doctrine. "Group pleading" is a presumption that "statements in prospectuses, registration statements, annual reports, press releases and other group published information, are the collective works of those individuals with direct involvement in the everyday business of the company." *In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d 433, 449 (S.D.N.Y. 2005) (quoting *In re BISYS Sec. Litig.*, 397 F. Supp. 2d 430, 438 (S.D.N.Y. 2005)). As a managing director or partner at Park Hill, one of three groups within PJT, *see* Am. Compl. ¶¶ 18, 20, Caspersen was not so senior that the Court can assume that he participated in

### A. Statements Concerning PJT's "Trusted Advisors" and "Deep and Long-Standing Investor Relationships"

Descriptions of PJT's professionals as "trusted advisors," with "deep and long-standing investor relationships" are classic examples of puffery. These statements are too general and too common in the industry for a reasonable investor to rely on them as statements of fact. *See ECA and Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 205-06 (2d Cir. 2009). In this respect, the statements in the PJT Information Statement, 2015 Form 10-K, and during the February 11, 2016, earnings call are indistinguishable from the statements regarding JP Morgan's "highly disciplined" risk management process and "standard-setting reputation for integrity" found by the Second Circuit not to be statements of fact in *ECA and Local 134 IBEW. Id.* at 205; *see also id.* at 206 (explaining that "no investor would take such statements seriously"). Even more squarely on point are the statements in *In re Virtus Investment Partners, Inc. Sec. Litig.* that "manager selection, performance oversight and product development are key elements of our approach," 195 F. Supp. 3d 528, 538 (S.D.N.Y. 2016), and the statements in *In re Marsh & Mclennan Cos., Sec. Litig.*, that the company was "dedicate[ed] to client service" and relied on "independence of thought and objective advice," 501 F. Supp. 2d 452, 475 (S.D.N.Y. 2006); *see also Lopez v. Ctpartners Exec. Search Inc.*, 173 F. Supp. 3d 12, 28 (S.D.N.Y. 2016) (explaining that "broad statements about a 'strong' culture that is 'results orient[ed],' and that the Company is committed to 'transparency' in the marketplace" are not actionable).

---

the preparation of PJT's public disclosures. *See Degulis v. LXR Biotechnology, Inc.*, 928 F. Supp. 1301, 1312 (S.D.N.Y. 1996) (applying group pleading presumption to a "narrowly defined group of highly ranked officers . . . who participated in the preparation and dissemination of a prospectus"). The Complaint includes no allegations that even remotely suggest that Caspersen was actually involved in preparing or reviewing PJT's annual or quarterly disclosures or that he participated in earnings calls. *See In re Alstom S.A. Sec. Litig.*, 406 F. Supp. 2d at 450. Additionally, group pleading does not apply to documents such as the Park Hill and PJT websites, which are not the sort of documents typically drafted or reviewed by senior corporate officers. *See DeAngelis v. Corzine*, 17 F. Supp. 3d 270, 281 (S.D.N.Y. 2014).

Relying on *In re Petrobras Sec. Litig*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015), Barrett argues that these statements are actionable because Defendants attributed PJT's success to the trust of its clients and client relationships. Opp'n at 4-5, 14. As in all things, context matters. In *Petrobras*, executives of the defendant corporation repeatedly made reassuring statements regarding the company's ethics and corporate culture at a time when the company was embroiled in a wide-reaching and high-profile public corruption scandal. *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 381; *see also In re Braskem S.A. Sec. Litig.*, No. 15-CV-5132 (PAE), 2017 WL 1216592, at *15 (S.D.N.Y. March 30, 2017) (distinguishing *Petrobras* on this basis and holding that statements describing as fundamental values integrity, compliance with law, and transparency were immaterial puffery). There is no analogous context for PJT's statements touting its role as a trusted advisor and its "deep long-standing investor relationships."

Even were the Court to find that these statements were material, Barrett has not alleged with any specificity how they are false or misleading. According to the Complaint, these statements are false because "while touting Park Hill's top-tier services and extensive relationships, Defendants failed to disclose the fact that one of [PJT's] key personnel was perpetrating a scheme to misappropriate fee payments from [PJT's] clients and to defraud investors of tens of millions of dollars." Am. Compl. ¶ 88. This allegation is conclusory and does not explain *how* Caspersen's fraud bears on the existence *vel non* of deep and long-standing client relationships or their importance to PJT's business.[5] The fact that Caspersen defrauded certain clients by leveraging PJT's client relationships does not mean that PJT did not have deep and long standing client relationships. *See* Am. Compl. ¶ 84. The fact that Caspersen committed

---

[5] Indeed, the fact that Caspersen was able to persuade sophisticated investors to invest in his fraudulent schemes suggests that he was, in fact, a trusted advisor, albeit that the trust was misplaced.

fraud while employed by PJT does not render PJT's statements that its long-term relationships and strong reputation were keys to its success false or misleading.  Am. Compl. ¶¶ 85-87.

B.    **PJT's Code of Conduct**

PJT's statements regarding its Code of Conduct are also not actionable.  Corporate codes of conduct are rarely actionable because, "[a]s the Second Circuit has noted, statements within such codes tend to be 'explicitly aspirational, with qualifiers such as . . . 'should.'"  *In re Braskem S.A. Sec. Litig.*, 2017 WL 1216592, at *14 (quoting *City of Pontiac Policemen's and Firemen's Retirement Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014)).  Both parties cite to the *Avon Products* case and it provides an instructive example of the difference between statements in a code of conduct that are non-actionable puffery and promises that might be material statements of fact.  In *Avon Products*, Judge Gardephe rejected as immaterial puffery statements in a code of conduct that Avon employees were "strictly prohibited" from paying bribes and that the business "continues to adhere to the highest standards of integrity, ethical conduct and good corporate citizenship."  *Avon Prods., Inc.*, 2014 WL 4832321, at *14.  On the other hand, Judge Gardephe considered statements that Avon had "a comprehensive and well-documented set of internal controls that provides reasonable assurance that its financial transactions are recorded accurately and completely, and its assets are safeguarded," to be a statement of fact because it was a sufficiently specific guarantee of "concrete steps" Avon had taken to comply.  *Id.* at *16; *see also In re Goldman Sachs Grp, Inc. Sec. Litig.*, No. 10-CV-3461 (PAC), 2014 WL 2815571, at *5 (S.D.N.Y. June 23, 2014) (statements that Goldman Sachs had in place "extensive procedures and controls that are designed to . . . address conflicts of interest" are actionable).

PJT's Code of Conduct is more similar to the non-actionable statements in *Avon Products*:  as alleged in the Complaint, the Code of Conduct states that the policies outlined in

the Code of Conduct are "designed to ensure that all directors, officers and employees of [PJT] not only conduct themselves lawfully at all times but also maintain the highest ethical standards in every aspect of their dealings with other employees, the business community, clients and government authorities." Am. Compl ¶ 95. And the Code further states that "[PJT] takes th[e] Code very seriously." Am. Compl ¶ 95. By their terms, these are aspirational statements – the Code is "*designed*" to ensure compliance and PJT takes the Code of Conduct seriously. Barrett has not identified any statement in the Code of Conduct that is a specific factual representation that PJT has in place any particular internal control that, in fact, it does not have. Instead, Plaintiff appears to be proceeding on the premise that because Caspersen did bad things while employed by PJT, its statements regarding the existence of its internal controls that are designed and intended to prevent fraud are per se false. That is simply not the case.[6]

## C.     SOX Certifications

Last are the SOX Certifications executed by Taubman and Meates in connection with PJT's 2015 Form 10-K filing. The SOX Certifications represent that Taubman and Meates "evaluated the effectiveness of [PJT's] disclosure controls and procedures," "disclosed in this report any change in [PJT's] internal control over financial reporting . . . that has materially affected, or is reasonably likely to materially affect, [PJT's] internal control over financial reporting," and have disclosed to PJT's auditors and board "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" and "any fraud, whether or not material, that involves management or other employees who have a significant role in [PJT's] internal control over financial reporting." Am. Compl. ¶ 92. Barrett

---

[6]     The Code of Conduct's policies on conflicts of interest and corporate opportunities are similar. *See* Am. Compl. ¶ 97. The fact that a code of conduct prohibits certain conduct by employees is not a factual representation that those policies will always be followed by all employees or that they are 100% effective. *See Avon Prods., Inc.*, 2014 WL 4832321, at *15-16 (prohibition on employees paying bribes, kickbacks, and payoffs is not material).

alleges that the SOX Certifications are false, or at least misleading, because a reasonable investor would infer from them that PJT had adequate internal controls, which, in light of Caspersen's fraud, cannot be true.

Putting aside the fact that a company with good internal controls can have rogue employees who circumvent those controls, the Complaint does not allege with particularity how the SOX Certifications are false. The SOX Certifications cited in the Complaint relate to whether Taubman and Meates evaluated and properly disclosed PJT's internal controls over financial reporting to the company's auditors and board of directors. *See* Am. Compl. ¶ 92. These certifications do not relate to whether PJT's controls were followed by Caspersen or whether PJT's controls were effective. *See In re PetroChina Co. Sec. Litig.*, 120 F. Supp. 3d 340, 358-59 (S.D.N.Y. 2015) (concluding that the same SOX certifications were not false when plaintiff did not allege any facts suggesting that the certifying defendants did not, in fact, evaluate the company's internal controls and did not, in fact, report any issues to the firm's board and auditors); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 370-71 (E.D.N.Y. 2013) (same). The Complaint does not allege: that Taubman and Meates failed to evaluate the effectiveness of PJT's controls; that there were any undisclosed changes in PJT's internal controls over financial reporting; that Taubman or Meates were aware of a deficiency or material weakness in PJT's internal controls over financial reporting that was not reported to PJT's auditors and board; or that Caspersen was an employee with a "significant role in [PJT's] internal control over financial reporting."[7] Am. Compl. ¶ 92.

---

[7] Barrett's opposition to the motion to dismiss argues for the first time that the SOX Certifications were false because Taubman and Meates certified that PJT was fully compliant with Section 13(a) of the Exchange Act, which requires, *inter alia,* every issuer to "devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

> (i) transactions are executed in accordance with management's general or specific authorization;
> (ii) transactions are recorded as necessary . . . to maintain accountability for assets;

Barrett's failure to plead an actionable false or misleading statement is fatal to the Complaint.

## 2.    Scienter

Even if Barrett alleged a material false statement, the Complaint would still be inadequate because it fails to allege plausibly that the Defendants acted with scienter.[8]  The PSLRA requires plaintiffs to allege a "strong inference" of scienter with the particularity required by Rule 9(b). 15 U.S.C. § 78u-4(b)(2)(A).  The Supreme Court has defined "scienter" as "a mental state embracing intent to deceive, manipulate, or defraud."  *Tellabs, Inc*, 551 U.S. at 319 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94 (1976)).  In order to determine whether the plaintiff's evidence gives rise to a "strong" inference of scienter, the Court must "take into account plausible opposing inferences" and consider "plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff."  *Id.* at 323-24.  The inference "must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling, thus strong in light of other explanations."  *Id.* at 324.

"[T]he scienter requirement is met where the complaint alleges facts showing either: 1) a 'motive and opportunity to commit the fraud'; or 2) 'strong circumstantial evidence of conscious

---

(iii) access to assets is permitted only in accordance with management's general or specific authorization; and
(iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

15 U.S.C. § 78m(b)(2)(B).  Barrett's theory appears to be that this certification was false because PJT's policies were inadequate to ensure that assets were accessed only with authorization because Caspersen was permitted to invoice clients without oversight from the billing department and Caspersen used that permission to send invoices with doctored wire instructions, temporarily diverting approximately $9 million in fee payments from PJT to himself.  *See* Opp'n at 13.  These allegations are not included in the Complaint (let alone with the required particularity).  Accordingly, the Court expresses no opinion as to whether these allegations would plausibly allege a false or misleading statement.

[8]     For purposes of analysis, the Court assumes, as do the parties, that Barrett plausibly alleges a false statement regarding PJT's internal controls.

misbehavior or recklessness.'" *Emps. Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ATSI Commc'ns*, *Inc.*, 493 F.3d at 99). For purposes of the PSLRA, "recklessness" is conduct that is "highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36, 39 (2d Cir. 2000)). "Where motive is not apparent . . . the strength of the circumstantial allegations must be correspondingly greater." *Id.* at 142 (quoting *Beck v. Mfrs. Hanover Trust Co.*, 820 F.2d 46, 50 (2d Cir. 1987)).

### A.    Caspersen's Knowledge

Caspersen was undoubtedly aware of the flaws in PJT's internal controls because he exploited them. As the Complaint alleges, he took advantage of his authority to invoice clients to divert temporarily approximately $9 million in client fees from PJT. Am. Compl. ¶¶ 73, 98. Whether Caspersen's scienter can be imputed to PJT depends on whether he was a sufficiently senior officer at the company, *see Thomas v. Shiloh Indus.*, No. 15-CV-7449 (KMW), 2017 WL 2937620, at *3 (S.D.N.Y. July 7, 2017), and whether the "adverse-interest" exception applies because Caspersen was not acting for the benefit of PJT, *see Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 467 (2010).

Courts in this district have not developed a bright-line rule to determine when an executive is sufficiently senior such that his or her scienter can be attributed to the entity. In *Thomas*, Judge Wood explained that courts have generally found that "'management level' employees can serve as proxies for the corporation" but "no court has defined what constitutes a 'management-level' employee." 2017 WL 2937620 at *3. Nonetheless, case law suggests that in making this determination, the Court should consider the individual's relative seniority at the

issuing entity and the connection between the executive's role and the fraudulent statements. For example, in *Patel v. L-3 Commc'ns Holdings Inc.*, this Court concluded that the CFO of a corporate segment accounting for one-third of the entity's total business, who was "situated one management level down from the CEO and CFO" of the corporate parent, was sufficiently senior that, for purposes of a motion to dismiss, his scienter could be attributed to the company.[9] No. 14-CV-6038 (VEC), 2016 WL 1629325, at *14 (S.D.N.Y Apr. 21, 2016). The knowledge of more junior officers may be attributable to the company if they had direct involvement in the aspect of the business at issue or the company's disclosure functions. *See, e.g.*, *In re Sanofi Sec. Litig.*, 155 F. Supp. 3d 386, 408-09 (S.D.N.Y. 2016) (imputing knowledge of employees "at the center" of the illegal scheme); *In re MBIA, Inc. Sec. Litig.*, 700 F. Supp. 2d 566, 590-91 (S.D.N.Y. 2010) (imputing knowledge of unit heads who spoke directly to the market). The Sixth Circuit has explained that courts should strike a balance between an overly narrow approach that would permit a corporation to "evade liability through tacit encouragement" and an overly broad rule that would hold corporations liable for the knowledge of low-level employees with no role in corporate decision-making or public disclosure. *See In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 475-76 (6th Cir. 2014).

The Complaint does not allege with particularity that Caspersen was a senior member of PJT's management or that he was involved in crafting PJT's internal controls or its public disclosures. As alleged in the Complaint, Park Hill accounts for a little less than one-third of PJT's overall business and, according to the Form 10-K quoted in the Complaint, Caspersen worked in one of four lines of business at Park Hill. Decl. of Amy. L. Barton (Dkt. 35) Ex. B at

---

[9]    Comparing cases is difficult because companies rarely use the same organizational structure and titles. A "senior vice president" at one company is not necessarily equivalent to a "partner" or "managing director" at another. In other words, the analysis is highly fact-specific.

4; *see also* Am. Compl. ¶ 87.  Unlike the executive in *L-3*, however, Caspersen was not a C-suite level employee at the Park Hill unit.  According to the Complaint, Caspersen was one of 14 partners at Park Hill and 31 partners at PJT generally.[10]  Although the Complaint does not describe PJT's organizational chart, it is not alleged that Caspersen was a part of Park Hill's senior management, which included a CEO and CFO, or that he reported directly to senior management at PJT.  Thus, Caspersen's role in the company weighs against imputing his knowledge to PJT.  The determinative question is whether Caspersen was involved in formulating PJT's internal controls or its disclosure of those policies to the market, not whether he was involved in defrauding PJT and its clients or whether he was a rainmaker for the firm.  The Complaint does not allege that Caspersen had any role in crafting the internal controls and compliance policies at issue in this case or in PJT's public reporting.

The adverse-interest exception would apply even if Caspersen were sufficiently senior to impute his scienter to the company.  The adverse-interest exception "directs a court not to impute to a corporation the bad acts of its agent when the fraud was committed for personal benefit."  *In re Bernard L. Madoff Inv. Sec. LLC*, 721 F.3d 54, 64 (2d Cir. 2013).  This is a narrow exception that applies only "where the fraud is committed *against* a corporation rather than on its behalf."  *Id.* (quoting *Kirschner*, 15 N.Y.3d at 467)).  Barrett argues that the adverse-interest exception does not apply because Caspersen's fraud was also a fraud on the market.  *See* Opp'n at 17-19.  Spelling out Barrett's theory, he alleges that Caspersen's failure to disclose to PJT the flaws in its internal controls (and the fact that he was taking advantage of them) operated as a fraud on the market because omitting those facts caused PJT to make misleading statements to the market

---

[10]     As noted above, the Complaint variously refers to Caspersen as a "partner," a "managing principal," and a "managing director."  The Complaint does not explain the significance of these titles at PJT.  Nevertheless, he was one of 14 employees at Park Hill who held the title of partner.

about the adequacy of its internal controls. According to Barrett, PJT benefited from this fraud, as demonstrated by the fact that PJT's stock declined once the fraud was revealed.

The cases Barrett cites in support of this argument are distinguishable. In *Stream SICAV v. Wang*, the CEO of a registered issuer used straw holders secretly to sell shares that were subject to a lock-up agreement. When the illicit sales were disclosed, shareholders brought a Section 10(b) claim based on statements by the CEO touting the lock-up agreement as tangible evidence of his confidence in the company. *See* 989 F. Supp. 2d 264, 268, 275 (S.D.N.Y. 2013). Judge Engelmayer concluded that the CEO's intent at the time he spoke to the market was attributable to the company because the statements were made for the benefit of the corporation, even if the CEO's underlying fraud benefitted only himself. *Id.* at 277. The fact patterns in *In re PetroChina Co. Sec. Litig.* and *In re Petrobras Sec. Litig.* are similar, although in those cases it appears that the issuer also benefited from the underlying fraud. *See In re PetroChina Co., Ltd. Sec. Litig.*, 120 F. Supp. 3d 340, 362 (S.D.N.Y. 2015) (adverse interest exception does not apply to CEO's failure to disclose corporate corruption); *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d at 382 (adverse interest exception does not apply to failure to disclose that financial results were inflated by bribery scheme).

In each of these cases the individual defendant who knew the truth made false statements to the market that benefited the issuer, albeit temporarily. None involved an agent like Caspersen, who made no statements to the market, *see infra* n.4, and whose alleged fraud on the market is his failure to disclose the fraud he was committing to the employer that he was defrauding. The Court is hard-pressed to see how PJT benefited from Caspersen concealing from PJT the fact that he was defrauding PJT and its clients. The New York case law upon which *Stream SICAV* relies does not contemplate a scenario in which the maker of the statement and the bad actor are separate. *See generally Teamsters Local 445 Freight Div. Pension Fund v.*

*Dynex Capital, Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008) (scienter may be alleged against an entity even though the speaker is not alleged to have acted with scienter). The New York Court of Appeals has focused on "[t]he crucial distinction [] between *conduct* that defrauds the corporation [which implicates the adverse interest exception] and *conduct* that defrauds others for the corporation's benefit [which does not]."[11] *Kirschner*, 15 N.Y.3d at 467 (emphasis added). Here Caspersen's conduct defrauded PJT and third parties for his personal benefit – not for the benefit of PJT. Moreover, extending the reasoning in *Stream SICAV* to instances in which an agent makes no statements to the market directly would make the adverse-interest exception a dead letter in securities cases involving fraud against the company because an employee's failure to disclose his own wrongdoing will almost always indirectly affect the company's public disclosures.

### B.    Taubman and Meates

The Complaint does not allege that Taubman and Meates were aware of Caspersen's fraud. Rather, Barrett alleges that Taubman and Meates failed to ensure that PJT had in place adequate internal controls, which is evidenced by the fact that Caspersen was permitted to invoice clients directly and by the fact that PJT allegedly did not monitor his personal trading. Opp'n at 19-20. "A strong inference of scienter may arise when a complaint alleges that defendants 'knew facts or had access to information suggesting that their public statements were not accurate," *In re Virtus Investment Partners, Inc. Sec. Litig.*, 195 F. Supp. 3d at 538-39

---

[11]    Likewise, the out-of-circuit cases relied on by Barrett address the applicability of the adverse-interest exception when an agent *acts* within his apparent authority to defraud an innocent third party. *See Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 496 (3d Cir. 2013); *In re ChinaCast Educ. Sec. Litig.*, 809 F.3d 471, 477 (9th Cir. 2015). Those cases are premised on the bad actor's apparent authority to deal on the corporation's behalf with third parties, and thus on the assumption that the bad actor has acted vis-à-vis the plaintiffs. That assumption does not hold as to Caspersen, who made no statements to the market and is not alleged to have any role in PJT's disclosures or internal controls. Caspersen's sole action, as it relates to the alleged disclosure violations in this case, was his concealment from *PJT* of the fact that he was defrauding PJT and its clients.

(quoting *ECA and Local 134 IBEW*, 553 F.3d at 199), or that the defendants "failed to check information they had a duty to monitor." *Blanford*, 794 F.3d at 306 (quoting *ECA and Local 134 IBEW*, 553 F.3d at 199). "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Novak*, 216 F.3d at 309.

Barrett has not alleged with particularity specific reports or statements that would have put Taubman and Meates on notice that PJT's internal controls were inadequate. The centerpiece of Barrett's scienter theory is that PJT permitted professionals such as Caspersen to invoice their clients directly. Am. Compl. ¶¶ 35, 104. Additionally, the Complaint alleges that PJT did not monitor Caspersen's personal trading and email accounts, which would have revealed the fraud. Am. Compl. ¶¶ 109-10. PJT is also alleged to have disregarded the fact that there were two late payments of fees associated with Caspersen's clients. Am. Compl. ¶¶ 34-40, 116. *Novak* requires Barrett to identify specific documents or oral statements from which the Court could infer that Taubman and Meates had notice of these alleged deficiencies. 216 F.3d at 309; *see also In re Lihua Int'l, Inc. Sec. Litig.*, No. 14-CV-5037 (RA), 2016 WL 1312104, at *15-16 (S.D.N.Y. Mar. 31, 2016). The fact that Taubman and Meates had a duty to review PJT's internal controls is not a substitute for specific allegations that the individual defendants were provided with information that demonstrated the inadequacy of PJT's internal controls. *See L-3 Commc'ns Holdings, Inc.,* 2016 WL 1629325, at *10.

The Court is unpersuaded that the so-called "core operations" doctrine is applicable to this case. The "core operations" doctrine is a presumption that senior managers are aware of facts that are "'critical to the long term viability' of the company and events affecting a 'significant source of income.'" *In re Hi-Crush Partners L.P. Sec. Litig.*, No. 12-CV-8557 (CM), 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013) (quoting *Cosmas v. Hassett*, 886 F.2d

8, 13 (2d Cir. 1989), and *Medis Inv. Grp. v. Medis Techs., Ltd.*, 586 F. Supp. 2d 136, 146

(S.D.N.Y. 2008)).  For example, in *In re Hi-Crush Partners*, the court applied the "core

operations" doctrine to assume that senior managers were aware that a contract accounting for

18% of corporate revenue had been repudiated.  2013 WL 6233561, at *26.  By comparison, the

Court cannot assume that senior officers at PJT would necessarily be aware of the details of

billing and compliance practices at a single unit of the company.

Assuming *arguendo* that Plaintiff had alleged with particularity Taubman and Meates'

knowledge of Park Hill's billing practices and its policies relative to surveillance of employees'

personal trading, the corresponding inference of scienter is not more compelling than the

inference that Taubman and Meates believed that PJT's controls were adequate.  The Court

cannot infer that Taubman and Meates were on notice that PJT's internal controls had serious

flaws from the fact that PJT permitted its professionals to invoice clients without direct

involvement from billing personnel.  While this probably is not a best practice, it is not an

"extreme departure" from prudent management practices without any legitimate explanation.

*Kalnit*, 264 F.3d at 142 (quoting *In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d at 39).  It is

equally plausible that Taubman and Meates believed that PJT had in place adequate systems to

monitor client remittances and billing records, so that personal client service could be

accommodated while still protecting the assets of the company.  By comparison, the cases relied

on by Barrett involve glaring violations of Generally Accepted Accounting Principles.  *See In re

Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 231-32 (S.D.N.Y. 2006); *Varghese v. China

Shenghuo Pharm. Holdings, Inc.*, 672 F. Supp. 2d 596, 608 (S.D.N.Y. 2009).  Similarly, the

allegation that PJT failed to monitor Caspersen's personal trading (and assuming Taubman and

Meates were aware of that) is subject to the competing and equally plausible explanation that

PJT did not believe it was necessary to do so in light of Caspersen's role at PJT or that Caspersen

concealed the account from the company.[12]  Finally, the fact that two invoices from Caspersen's

clients were paid one or two months late because of his misconduct (and again, assuming that

Taubman and Meates were aware of this fact) is not, absent more, strong circumstantial evidence

that Taubman and Meates ignored evidence that PJT's internal controls were inadequate.  Given

the relative brevity of the delay, a number of competing inferences are possible.  Taken together

or separately, none of the circumstantial evidence of inadequate controls and "red flags" alleged

in the Complaint supports a cogent inference of scienter.

**3.      Section 20(a) Claims**

In order to state a claim under Section 20(a) a plaintiff must allege  "(1) a primary

violation by the controlled person, (2) control of the primary violator by the defendant, and (3)

that the defendant was, in some meaningful sense, a culpable participant in the controlled

person's fraud."  *Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*, 750 F.3d 227,

236 (2d Cir. 2014) (quoting *ATSI Commc'ns Inc.*, 493 F.3d at 108).  Barrett concedes that his

Section 20(a) claim rises and falls with his Section 10(b) claim.  *See* Opp'n at 25 ("Because the

[Complaint] alleges an underlying violation by PJT and that [] Taubman and Meates controlled

PJT, it states a Section 20(a) claim.").  Accordingly, because the Court has concluded that the

Complaint does not plausibly allege a Section 10(b) claim, Barrett's Section 20(a) claim must

also be dismissed.

---

[12]      Barrett argues that the failure to monitor Caspersen's personal trading was an extreme departure from prudent management practices and cites in support a white paper from the Securities Industry Association ("SIA"). Am. Compl. ¶ 111.  But the referenced paper does not support Barrett's theory that it is an extreme departure from sound management practices to fail to monitor all employees' personal trading.  To the contrary, even the SIA states only that companies in the securities industry "often" monitor employees' "business transactions and communications."

**4.      Leave to Amend**

Barrett requested leave to amend in the event the Court granted PJT's motion to dismiss. "Leave may be denied 'for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party.'" *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir. 2007) (additional citations omitted)).  Although Barrett did not attach a proposed second amended complaint, his opposition brief identifies additional facts about Caspersen's fraud and a revised theory of how PJT's SOX Certifications were false.  *See* Opp'n at 8 n.3, 13.  The Court is skeptical that Barrett can cure the fundamental flaws in the Complaint as currently drafted, but will nevertheless grant Barrett leave to move to file a second amended complaint.

## CONCLUSION

The Defendants' motion to dismiss is GRANTED WITHOUT PREJUDICE.  Barrett's motion for leave to amend is due by **September 29, 2017**.  The motion must include his proposed Second Amended Complaint, red-lined against the Amended Complaint.  The Clerk of the Court is respectfully directed to close the open motion at docket entry 33.

**SO ORDERED.**

Date:  **September 8, 2017**                                   **VALERIE CAPRONI**
          **New York, New York**                              **United States District Judge**